788 So.2d 1154 (2001)
EXXON PIPELINE COMPANY
v.
George HILL, Individually and as Trustee of the Mrs. Elizabeth J. Hill Trust for the Children of John Hill, Jr., et al.
Exxon Pipeline Company
v.
Price LeBlanc, Shirley Wolf LeBlanc, and Simon Corporation of Louisiana.
Nos. 2000-C-2535 and 2000-C-2559.
Supreme Court of Louisiana.
May 15, 2001.
*1156 Gregory M. Anding, Gary A. Bezet, Robert E. Dille, Kean, Miller, Hawthorne, D'Armond, McCowa & Jarman, Baton Rouge, Counsel for Applicant in No. 2000-B-2559.
Pamela P. Baudin, Stanley P. Baudin, Baton Rouge, Patrick W. Pendley, Plaquemine, David M. Ellison, Jr., Baton Rouge, Penrose C. St. Amant, Gonzales, Counsel for Respondent in No. 2000-B-2559.
Carol Galloway, Baton Rouge, Mark A. Marionneaux, Baton Rouge, Counsel for Plantation Pipeline Co. (Amicus Curiae).
David L. Carrigee, New Orleans, Robin M. Hunziker, Counsel for Marathon Ashland Pipeline (Amicus Curiae).
Robert J. Young, Jr., New Orleans, Robert J. Young, III, New Orleans, Counsel for Koch Pipeline Co. (Amicus Curiae).
Allen D. Darden, Baton Rouge, Kimberly L. Hood, Counsel for MCI Worldcom Network Services Inc. (Amicus Curiae).
A. J. Gray, III, Anna R. Gray, Lake Charles, Counsel for Stream Family Limited Partnership, Michael X. St. Martin, Virginia R. St. Martin, Sue Mary Granger (Amicus Curiae).
Davis B. Allgood, Leon Gary, Jr., Robert W. Scheffy, Jr., Jones, Walker, Waechter, Poitevant, Carrere & Denegre, Baton Rouge, Counsel for Applicant in No. 2000-C-2535.
David M. Ellison, Jr., Baton Rouge, Counsel for Respondent in No. 2000-C-2535.
Kenneth P. Carter, New Orleans, Counsel for Entergy Louisiana, Inc., Entergy Gulf States, Inc. (Amicus Curiae).
Galen S. Brown, New Orleans, Counsel for Williams Co. Inc., Transcontinental Gas Pipe Line Corp., Williams Gas Pipelines Central Inc., Texas Gas Transmission Corp., El Paso Energy Corp. (Amicus Curiae).
Robert H. Carpenter, Jr., Baton Rouge, E. Kay Kilpatrick, Roy A. Mongrue, Jr., Baton Rouge, Richard P. Ieyoub, Baton Rouge, Counsel for State of Louisiana (Amicus Curiae).
Henry H. Bernard, Jr., Baton Rouge, Patrick M. McCarthy, Counsel for Louisiana Farm Bureau Federation (Amicus Curiae).
TRAYLOR, Justice.
We granted certiorari in these two expropriation cases and consolidated them for oral argument in order to clarify the issue of what is the proper method of determining "just compensation" in an expropriation suit. Specifically, we are called upon to answer the following questions: (1) whether the traditional method of valuing properties by using property comparables is the proper means by which to determine just compensation for a landowner whose property has been expropriated; and (2) whether the measurement of the expropriated land should be on a per rod or on a per acreage basis. After reviewing the record and applicable law, we hold that the traditional method of using property comparables for valuing property in an expropriation case is the preferred method and that measurements, in litigated cases, should be calculated on a per acreage basis.

FACTS AND PROCEDURAL HISTORY

Exxon Pipeline v. George Hill, et al.
In 1936, Exxon Pipeline Company ("Exxon") obtained its first pipeline servitude *1157 across the Hill property.[1] The terms of that servitude agreement did not specify either the length or the width of the land affected by the right of way granted to Exxon. Subsequent amendments to the 1936 servitude agreement limited Exxon's right of way to an eighty foot wide strip of land and allowed for the installation of eight pipelines.
In 1995, Exxon obtained another conventional servitude by agreement with the Hills. Exxon was allowed to place five pipes in a fifty to seventy-five foot wide strip across the land. The right of way obtained in 1995 is located adjacent to and runs parallel with the eighty foot wide right of way obtained earlier by Exxon.[2]
On January 13, 1998, Exxon petitioned the court, seeking entitlement to a permanent servitude for the installation of three pipelines. After a trial on the merits, the trial court awarded the Hill family $17,172 as just compensation for the expropriated property.
The Hill family appealed the trial court's judgment to the Court of Appeal, First Circuit, arguing the trial court erred in finding the testimony of their expert real estate appraiser inadmissible, which therefore tainted the court's factual conclusion of the highest and best use of the expropriated property.
The court of appeal reversed the trial court, conducted a de novo review of the evidence, and awarded the Hill family $251,505 as just compensation for their loss. Exxon Pipeline Co. v. Hill, 99-0073 (La.App. 1st Cir.6/23/00) 763 So.2d 144. The court's primary concern was the trial court's refusal to allow the testimony of the landowners' expert, Oren Russell ("Russell"). After conducting an analysis under Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the court determined the landowners' expert's opinion was not unreliable and should have been allowed into evidence.
First, the court agreed with Russell that the highest and best use of the property is as a pipeline corridor. In doing so, the court employed Russell's method of using the value which other pipeline companies paid for similar right of ways and/or servitudes. It found that the method of valuation utilized by Russell, i.e. utilizing pipeline servitude comparables, has a reliable basis and a valid connection to the pertinent inquiry of valuation of just compensation for the subject property. Thus, the court agreed with Russell that the traditional method of valuing of pipeline servitudes by use of land comparables is erroneous. Finally, the court determined the proper measurement of pipeline servitudes is by rod rather than the traditional per acre measurement.

Exxon Pipeline v. V. Price LeBlanc, et al.
In May 1997, the LeBlancs purchased approximately 418 acres of undeveloped land in Iberville Parish for $1,000 per acre. Approximately six acres of the land purchased are located on the western side of Highway 30; the remaining approximate 412 acre tract is east of the highway.[3]
*1158 On March 11, 1998, Exxon filed a petition for expropriation averring entitlement to temporary and permanent servitudes for the construction and installation of three pipelines on the LeBlancs property. The LeBlancs filed an answer, challenging the need and necessity of the expropriation, the route selection, as well as the size of the parcels of land upon which the servitude was proposed to be situated. In the alternative, the LeBlancs claimed entitlement to the fair market value of the property taken and severance damages for the reduction of the fair market value of the remainder of their land.
The permanent servitude which Exxon seeks encumbers two separate parcels of land within the 412-acre tract of land. The eastern-most parcel (Tract 1) is approximately 22.83 feet wide by 290 feet in length; the westerly tract (Tract 2) is 30 feet wide (at the widest part) by approximately 600 feet long. Both parcels are subject to numerous existing servitudes which allow the respective servitude owners to install inter alia power lines, pipelines and a fiber optic cable as set forth in their respective servitude agreements. Tract 1 is entirely encumbered by preexisting servitude agreements, while all but.285 of the 412 acres which comprise Tract 2 are encumbered.[4]
On October 30, 1998, the trial court signed a judgment and concluded that Exxon was a common carrier of petroleum products with the power to expropriate, and awarded $125,904.14 as just compensation to the LeBlancs.
Exxon appealed the trial court's decision and the Court of Appeal, First Circuit, affirmed the lower courts' rulings. Exxon Pipeline Co. v. LeBlanc, 99-1437 (La.App. 1 Cir. 6/23/00) 763 So.2d 128. The court agreed with the trial court that the land-owners' expert, Russell, was reliable and that the highest and best use for the subject property was as a pipeline corridor. The court noted that there were differing highest and best, depending on the tract of land. Recognizing the differing "highest and best" uses of the land, the court nonetheless concluded that the "highest and best" use of the land which the permanent servitude was to be placed was properly designated as a pipeline corridor.
The court also rejected Exxon's argument that the trial court used an inappropriate method, rod measurements, to determine compensation. It concluded, based on the highest and best use, that the strip of land at issue as a pipeline/utility corridor is measured in the pipeline industry by rod rather than by acre, as supported by the trial testimony. Thus, the court found all the evidence relative to measurement and valuation supported the appraisal technique offered by the landowners' expert.
Exxon filed two separate applications in this court seeking review of the lower court's opinions. We granted certiorari and consolidated the matters for oral argument. Exxon Pipeline Co. v. Hill, 00-2535 (La.11/27/00), 774 So.2d 986; Exxon Pipeline Co. v. LeBlanc, 00-2559 (La.11/27/00), 775 So.2d 448.

DISCUSSION
The right to expropriate is given to private owners and operators of pipelines for the transmission or transportation as a *1159 common carrier of petroleum, petroleum products and petroleum by-products pursuant to La.R.S. 19:2(8). Expropriation of private property for public purpose is authorized by Louisiana Constitution Article I, Section 4, which provides:
Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. Property shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings, whether the purpose is public and necessary shall be a judicial question. In every expropriation, a party has the right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss. No business enterprise or any of its assets shall be taken for the purpose of operating that enterprise or halting competition with a government enterprise. However, a municipality may expropriate a utility within its jurisdiction.
In 1974, the Constitution was amended to provide that "the owner shall be compensated to the full extent of his loss."[5]West Jefferson Levee Dist. v. Coast Quality Const. Corp., 640 So.2d 1258 (La.1994). The history of Article I, Section 4 reveals a desire to increase the level and scope of compensation beyond that provided by pre-existing state law. The change from the 1921 constitution's language ("just and adequate compensation") to the new phrase ("compensated to the full extent of his loss") was deliberate, prompted by a belief on the part of the sponsors that inadequate awards had been provided under the prior law. State Through Dept. of Transp. and Development v. Chambers Inv. Co., Inc., 595 So.2d 598 (La.1992); L. Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La. L.Rev. 1, 15 (1974); State, Dept. of Transp. & Dev. v. Dietrich, 555 So.2d 1355, 1358-59 (La.1990); State Through Dept. of Highways v. Constant, 369 So.2d 699, 702 (La.1979) (the purpose of the additional language in Article I, Section 4 was to compensate an owner for any loss sustained by reason of the taking, and not merely restricted as under the former constitution to the market value of the property taken and to reduction in the market value of the remainder).
Armed with the constitutional mandate of "compensating an owner to the full extent of his loss," we shall now explore the issue of whether the defendants were justly compensation for the land expropriated by Exxon.

Just Compensation
The basic purpose in all expropriation cases is to determine the "full extent of the loss" as required by our constitution. Although there is no specific formula set forth by the Legislature which may aid courts in determining the "full extent of loss," La.Rev.Stat. 19:9 provides some guidance as to how to compensate a property owner. La.Rev.Stat. 19:9 provides:
In estimating the value of the property to be expropriated, the basis of assessment shall be the value which the property possessed before the contemplated improvement was proposed, without deducting therefrom any amount for the *1160 benefit derived by the owner from the contemplated improvement or work.
La.Rev.Stat. 19:9(A).
Thus, La.R.S. 19:9 guides our inquiry to a determination of "the value which the property possessed before the contemplated improvement was proposed, without deducting therefrom any amount for the benefit derived by the owner from the contemplated improvement or work." La. Rev.Stat. 19:9.

Fair Market Value
In State v. Bitterwolf, 415 So.2d 196 (La.1982), this court explained that the legislature and the courts have developed rules which accept the fair market value of the property as a relevant consideration in determining just compensation. Fair market value has consistently been defined as the price a buyer is willing to pay after considering all of the uses that the property may be put to where such uses are not speculative, remote or contrary to law. West Jefferson Levee Dist. v. Coast Quality, 93-1718 (La.5/23/94), 640 So.2d 1258. In determining fair market value of the land taken in an expropriation case, consideration is to be given to the most profitable use to which the land can be put by reason of its location, topography, and adaptability. City of Shreveport v. Abe Meyer Corp., 219 La. 128, 52 So.2d 445, 447 (1951), affirmed as amended, 223 La. 1079, 67 So.2d 732 (1953); State, Dep't of Highways v. Rapier, 246 La. 150, 164 So.2d 280 (1964). This theory, of taking the latter factors into consideration, is commonly known as the "highest and best use" doctrine.

Highest and Best Use
The highest and best use of land in expropriation cases involve several factors. Factors which may be considered include: market demand; proximity to areas already developed in a compatible manner with the intended use; economic development in the area; specific plans of business and individuals, including action already taken to develop the land for that use; scarcity of the land available for that use; negotiations with buyers interested in the property taken for a particular use; absence of offers to buy the property made by the buyers who put it to the use urged; and the use to which the property was being put at the time of the taking. Bitterwolf, 415 So.2d 196, 199 (La.1982), State v. Constant, 369 So.2d 699, 702 (La.1979). It is well established that the current use of the property is presumed to be the highest and best use and the burden of overcoming that presumption by proving the existence of a different highest and best use based on a potential, future use is on the landowner.
The parties presented two expert real estate appraisers to support their positions regarding the "highest and best" use of the property. The LeBlanc and Hill families presented Oren W. Russell,[6] while Exxon presented Jack Evans ("Evans"). Russell testified that the highest and best use for the property at issue is as a pipeline corridor. Conversely, Evans testified that the highest and best use for the Hill property is for industrial use and that the highest and best use for the LeBlanc property is for light industrial commercial use.
First, Evans defined the parent tract. He noted that there were several use tracts within the ownership but concluded that only one tract was germane to the valuation for purposes of this suit. Specifically, Evans defined a three hundred and fifty (350) acre parcel of land.[7] Evans *1161 testified that the existing use pattern of the parent tract revealed that the land was being used to grow soybeans and sugar cane and was under an agricultural lease. Considering the latter factors, Evans concluded that the property's highest and best use is light industry with an interim agricultural use. Evans stated that his determination included several factors: (1) what is physically possible on the property; (2) what is legally possible; (3) what is financially feasible; and (4) what is maximally productive. Evans was emphatic that none of these factors take into consideration any speculative or future characteristics of the land. Of significance, Evans cited to the several legal restrictions on the use of the property. First, Evans observed long-term agricultural leases which clearly restricts use of the Hill property.[8] Second, he pointed to an industrial encroachment and significant residential use. Finally, Evans stated that a trend in the buying patterns of land surrounding the Hill property supported his theory of light industrial use. While the current use of the property was for agriculture, Evans indicated that it is more probable than not that any sale of the subject tract would be for industrial use since the trend in the area supported a growing light industrial setting. Based on these factors, Evans concluded that the highest and best use is for light industrial and agricultural use.
As to the LeBlanc property, 412 acres located east of Highway 30 was designated as the parent tract. An examined sales of tracts of land varying in size from two to twenty acres was conducted. It was declared that the highest and best use for the one parcel of land for which Exxon proposed locating its permanent servitude was within the light industrial, commercial or speculative investment portion of the 412-acre parent tract; the other parcel of land was located in an area that had a highest and best use for residential purposes.
Conversely, Russell testified that the highest and best use of both properties is as a pipeline or utility corridor as the existence of numerous pipeline servitudes already burdening both properties created a pipeline corridor.[9] He maintained that the land was so burdened with servitudes that the owners could not use the land for any other purpose other than to grant servitudes for pipeline or utility companies. Russell's sole basis for finding the LeBlanc land's highest and best use as a pipeline corridor rest solely within his determination that there existed at least five other pipelines on the land, namely two Liquid Carbonic Company pipelines, one Air Products pipeline, one Bridge Line and one Exxon pipeline. While he recognize that the land had multiple uses, such as agricultural and/ or residential use, his final conclusion was that the most efficient use of the LeBlanc land is as a pipeline/utility corridor.
In expropriation proceedings the value of land is fixed with reference to the loss sustained by the owner, not as enhanced by the purpose for which it was taken. U.S. v. Chandler-Dunbar Water Power Co. 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1913) (that the property may have to the public a greater value than its *1162 fair market value affords no just criterion for estimating what the owner should receive); State Through Dept. of Highways v. Hayward, 243 La. 1036, 150 So.2d 6, 8 (La.1963); Yazoo & M.V.R. Co. v. Teissier, 134 La. 958, 64 So. 866, 867 (1914). The characteristics examined by the experts cannot be speculative and must consider the property in its use at the time of expropriation.
In the Hill case, Evans testified that the land is currently being used for agricultural use and pointed out that there were several legal limitations on the landowners' use of the land. The legal restrictions burdening the land cannot be summarily dismissed simply because the landowners contemplate a future use for their property. As to the LeBlanc land, the existence of pipelines do not conclusively, in and of itself, establish that the highest and best use is as a "pipeline corridor."
While there are existing pipelines on both parcels of land, the new contemplated additions seeks to superimpose new pipelines over already existing ones, therefore no new land is being used. Based on the current use of the properties coupled with the fact that insufficient evidence was presented to support the theory that the highest and best use of the property is as a pipeline corridor, we find the court of appeal erred in finding the highest and best use of the properties is as a pipeline corridor.
Accepting Exxon appraiser's conclusions regarding the highest and best use of properties, we next explore the methodology used for determining the fair market value of the properties.

Comparables
Just as both experts' disagree as to the highest and best use of the property, they also disagree as to which comparables should be used in valuing the servitudes. The specific formulas of valuation developed by the courts are all designed to assure that the condemnee is compensated to the "full extent of his loss." These formulas are all means to this end; there is no artificial formula by which alone such compensation may be determined. Specific formulas of valuationsuch as willing buyer-willing seller, per-acre or per-lot, front-foot or average-value, income-capitalization, replacement-cost, or othershould be used to effectuate this end, not to defeat it. State, Dept. of Highways v. Terrace Land Co., 298 So.2d 859 (La.1974); State, Department of Highways v. Crow, 286 So.2d 353 (La.1973); State, Department of Highways v. Blair, 285 So.3d 212 (La.1973); State, Department of Highways v. Hoyt, 284 So.2d 763 (La.1973). As such, we must examine the formulas and consider which approach is reasonably calculated to insure that property owners receive just compensation in expropriation proceedings.
There are three generally accepted appraisal techniques: (1) the market approach; (2) the cost approach; and (3) the income approach. See generally Uniform Standards of Professional Appraisal Practice (1998 Edition), The Appraisal of Real Estate, (10th Ed.)
Under the market approach, the appraiser considers the market value estimate which is predicated upon prices paid in actual market transactions and current listings, i.e. comparable sales. The cost approach method requires the appraiser to derive the value the property by estimating the replacement or reproduction cost of the improvements; deducting therefrom the estimated depreciation; and then adding the market value of the land, if any. Finally, in utilizing the income approach, the appraiser uses an appraisal technique in which the anticipated net income is processed to indicate the capital amount of the investment which produces the net income.
*1163 The jurisprudence has generally held that the "market approach," or the use of comparable sales in the vicinity of the land sought to be expropriated, is the primary tool of analysis of fair market value because it is, in most cases, likely to produce more accurate results. State, Dept. of Highways v. Crow, 286 So.2d 353, 356 (La.1973); Iberia Parish v. Cook, 238 La. 697, 116 So.2d 491, 495 (1959); State, Dept. of Transp. and Dev. v. Winn, 463 So.2d 648, 651 (La.App. 4th Cir.1984) ("In cases of expropriation, the more reliable and approved method for determining the fair market value of the property taken is to consider comparable sales, adjusting them to compensate for their relative bad and good features with regard to the expropriated property.").
Evans testified that the traditional approach for valuing property is to use market value comparables. He explained that comparable sales of tracts of land are reduced to a value per acre and then prorated to the square footage of the strip of land affected by the right of way to reflect the value of the property. In calculating the amount the landowner is entitled to receive the prorated, per acre amount is depreciated by eighty percent (80%) for each subsequent servitude imposed on the affected tract of land.
Evans researched the comparable land sales and listing of properties in the surrounding parishes of the areas in questions. He considered only those properties which possessed similar characteristics and land uses. Evans method explored size of the land, the zoning restrictions, topography, and the highest and best use.[10] Utilizing the comparables, Evans concluded that the Hills were entitled to $17,172 as just compensation for the addition of three pipelines.[11]
Conversely, Russell testified that a true and accurate valuation method is to use pipeline servitude comparables. Noting that the amounts of compensation paid to landowners by pipeline companies on the open market are consistently superior to the amounts yielded by the traditional parent tract/acreage, eighty percent (80%) depreciation approach, Russell sought to research the amounts that the pipeline companies paid the landowners for the servitudes. The empirical data submitted by Russell included copies of executed "Grant of Right of Way(s)." A review of these documents reveals that many of the transactions indicate that the pipeline companies paid amounts such as ten dollars ($10) or one hundred dollars ($100) "plus other valuable consideration" for the servitudes.[12] Russell's approach considered *1164 these values and converted the values to amounts per rods the pipeline company paid for the servitude.
Under Russell's approach the contemplated value of the land is based on the comparable of other pipeline servitudes purchased by pipeline companies. Russell conducted studies and created a data base which list the amount paid by the companies. However, speculation remains as to the exact amount paid for the servitudes. The comparables relied on by Russell leave many unanswered questions such as what was the "other valuable consideration" paid to the landowners. Moreover, the comparables which contain exact dollar amounts fail to reference any extrinsic factors which may need to be considered such as whether the servitude was heavily bargained for or whether the contemplated servitude was the first or last servitude in a pipeline project. Because there are so many extrinsic factors which are considered when pipeline companies make offers, it is germane to our focus that we review only data which is not inflated or containing other factors which are not verifiable.
We have thoroughly studied the appraisals and testimony of both experts and conclude that Evans' appraisal technique is the most reliable and persuasive as to the value of all the subject tracts. He logically adjusted each comparable for size, time, topography and shape and use; whereas the landowners' expert did not. Thus, we conclude that the court of appeal erred in relying on the method utilized by Russell.

Per Acre v. Per Rod
In the concurring opinion of Judge Shortess in Hill, he noted that lower courts are without guidance as to whether to use the per acreage or the per rod method of valuation. He concluded that "there is a split in the circuits. The first and fourth circuits are more in line with the per-rod theory, while the third circuit seems to be more favorable to the per-acre theory ... I think it is time to unconditionally rule that the per-rod theory is the favored one, especially on land that is already burdened with multiple pipeline servitudes."
During oral argument, Exxon conceded that it is well accepted in the pipeline community that negotiations for servitudes are often couched in terms of "rods." Exxon further explained that the "per rod" valuation is based on an arbitrary price which the pipeline company would be willing to pay rather than litigating the case. Exxon stated that the price pipeline companies traditionally offer are often higher than that which the landowner is due.
A "rod," by definition, is nothing more than a line between two points, but as such it has no width. The per rod comparables appear to show the value of the property as impacted by the expropriation itself, which is in stark contrast to existing expropriation law. Rods standing alone fail to consider many important attributes which insure proper valuation of land. As stated above, a landowner may be compensated $100 per rod for his property because his servitude was the last remaining parcel needed by a company. By contrast, the same landowner may only be paid $15 per rod because his is the first parcel purchased. Attempting to derive a system to value pipeline servitudes by rods would lead to higher and unfair valuation of property.
While this court recognizes the concern posed by the landowners and Judge Shortess regarding the per rod valuation, we find that the use of the per rod method would be in derogation of the Louisiana *1165 Constitution. Art. I, Section 4 states that a property owner is to be compensated for loss caused by the expropriation. If we are to allow the per rod method, landowners would receive more than "the full extent of his loss," they would receive compensation far greater than due. Clearly, this is not what is intended by the constitution. As Judge Parro explained in his dissent in Hill:
"Expropriation exists in our Constitution because the public recognizes that some private property rights must give way for the public good, provided the private property owner is fully and fairly compensated for his loss. The radically new valuation method approved by the majority in this case will add incalculable costs to the public when these expenses are passed on in the prices of oil, natural gas, electricity, water, and other utilities. Thus, the public will suffer, while a few property owners will reap a windfall, simply because they fortuitously own property within the shortest and most efficient routes for the transport of these necessities. The benefits of expropriation intended for the public good will be severely curtailed by this valuation approach." Hill, 763 So.2d at 161.
In keeping with the constitutional mandate of compensating a landowner for the loss sustained as a result of the expropriation, we hold that the per rod valuation is not a proper method of determining value in expropriation proceedings in a court action.

CONCLUSION
Based on the testimony of the experts and the evidence presented, we find that the court of appeal erred in reversing the trial court's ruling in Exxon v. George Hill. Further, we reverse the court of appeal's ruling in Exxon v. LeBlanc. The reasons set forth by the court of appeal fail to consider the constitutional dictates which require that a landowner be compensated for their loss. Any attempts to compensate the landowner for more than their loss based on speculative valuation methods and arbitrary calculations violates the tenets Article I, Section 4 of the Constitution.

DECREE
For the reasons assigned, the judgment of the Court of Appeal, First Circuit, in Exxon v. George Hill, 00-C-2535 is hereby reversed and the ruling of the trial court awarding the Hills $17,172 is reinstated. In Exxon v. Price LeBlanc, 00-C-2559, the judgment of the court of appeal is reversed and the matter is remanded to the trial court for a determination of the proper value of compensation due to the LeBlanc family, consistent with this opinion.
Exxon v. Hill, 00-C-2535Reversed;
Exxon v. V. Price LeBlanc, 00-C-2559 Reversed and Remanded.
LEMMON, J., concurs.
KNOLL, J., concurs with reasons.
KNOLL, Justice, concurring.
Our Constitution provides that "[p]roperty shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner, whether the purpose is public and necessary shall be a judicial question." LA. CONST. art. I, § 4. The measure of "just compensation" is not an easy question to answer in present day expropriation cases. The only guidance the Legislature has given us in determining "just compensation" is that "[i]n estimating the value of property to be expropriated, the basis of assessment shall be the value which the property possessed before the contemplated improvement was proposed, without deducting therefrom any amount for the benefit derived by the owner from *1166 the contemplated improvement or work," and the "owner shall be compensated to the full extent of his loss." See LA.REV. STAT. ANN. § 19:9.
In expropriation cases, the power of the State and private entities authorized by law to take property competes with the sacred and fundamental rights of citizens to own, control, use, enjoy, protect, and dispose of property. Hundreds if not thousands of landowners are affected by pipeline servitudes and all of our citizens are affected by the policy issues that support expropriation. We must insure that abuses in expropriation cases do not occur, and abuses do occur both ways. Large companies imbued with the power of expropriation sometimes abuse their power to take property at what are seemingly unfair prices, and property owners sometimes abuse their power by demanding far more than their property is worth.
With this in mind, I concur to express my view that valuation of property in expropriation cases is an open question and each case should be judged on its own under its individual facts and circumstances. Inadequate and inaccurate valuations run rampant and we must strive to find valuations that serve the purpose of protecting property rights while allowing public interests to be served. Because of the important public policies and fundamental rights involved in expropriation cases, it would be helpful if the Legislature took action to clarify standards for valuation under LA.REV.STAT. ANN. § 19:9. In doing so, the Legislature can set standards outside the framework of complex and intense litigation, hold hearings, and hear from all interested persons in this matter. For these reasons, I respectfully concur.
NOTES
[1] The land at issue in this litigation is approximately 900 acres. At the time of expropriation by Exxon, the land was being leased by others for agricultural purposes and generally used for sugar cane farming.
[2] The subject property which Exxon has chosen to expropriate in this instance consists of a permanent pipeline servitude superimposed on the right of way conventionally granted to it in the 1995 pipeline servitude agreement.
[3] The parcels of land upon which Exxon seeks to locate the temporary construction servitude and the permanent servitude are totally contained within the 412-acre tract.
[4] Exxon also sought the right to place a temporary servitude on the land. The temporary servitude as proposed would encumber land totaling 4,096.33 feet in length. The width of the temporary servitude is 50 feet to the south of the land encumbered with the permanent pipeline servitude and 25 feet to the north of it. Much of the LeBlanc land Exxon seeks to utilize for the temporary construction servitude is contemplated for the construction and installation of the three pipelines on land owned by adjoining landowners to the north.
[5] Article I, Section 2 of the 1921 Louisiana Constitution provided:

No person shall be deprived of life, liberty or property, except by due process of the law. Except as otherwise provided in this Constitution, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid. [Emphasis added]
[6] In the Hill case, the trial court refused to accept Russell as an expert, but allowed defendants to proffer his testimony for appeal.
[7] The parent tract was defined as a parcel of land which was bounded by the natural drainage canal, Lafiton Lane, Rosedale and Louisiana Highway 1.
[8] Evans reviewed the leases and testified that the Hills could buy out of the leases. However, it was his opinion that the buy-out would be very difficult as the provisions of the lease required that the Hills pay damages to the lessor which would compensate the lessor for eighty percent (80%) its future profits it would have realized less the cultivation cost.
[9] A review of Louisiana jurisprudence reveals that the designation of property as a pipeline corridor is a novel issue in this state. While courts have used the term "pipeline corridor," the cases do not address the issue of whether the highest and best use of the property is as a pipeline corridor.
[10] Evans' report contains the comparables from twenty-two (22) land sales. The sale dates range from the late 1987 to 1995, and the prices paid per acre for the comparable land sales were between $2,000 and $15,000 per acre. As for the comparable land listings, four listings were used. These values represent a range from $6,200 to $15,000 per acre. Adjustments were made for all comparables used in order to compensate for various differences.
[11] Evans surmised that the servitude for the three new pipeline servitudes on the Hill property amounted to the taking of 7.52 acres at $14,000 per acre. Since there were existing pipelines on the land, Evans made adjustments and valued the servitude based on the fact that the landowners were previously compensated for the existing pipelines.
[12] In fact, Russell admitted in his report submitted into evidence in the LeBlanc suit that it is in "the appraiser's experience in researching recorded pipeline servitude acquisitions over the years reveals that the compensation is usually recorded as being $10 or $100 and other valuable consideration almost without exception and some servitude documents include a confidentially [sic] clause (or have some on the side). As a consequence, there is no readily available source regarding the going market price for pipeline right-of-ways at any given point in time experience indicates that the pipeline companies will not furnish the data when asked, and, most individuals will not divulge the price paid because of the confidentially [sic] agreement."