PAUL A. BONIN, Judge.
11 Borgnemouth Realty Company, Ltd., is the owner of immovable property situated in St. Bernard Parish. As a result of storm damage caused to the levee adjoining the Mississippi River Gulf Outlet, the parish president by executive order commandeered the use of private property, including Borgnemouth’s, to obtain borrow material and to gain access for the repair and rehabilitation of the levees in the parish. Importantly, the executive order specified that the Parish was not taking full ownership of the land and, to the issues presented in this case, was acquiring an “assignable right and an easement to clear, borrow, excavate and remove soil, dirt, and other materials from said immovable property.” The parish president then tendered an irrevocable right to the Lake Borgne Basin Levee District for its use in obtaining borrow material and access to the levees and constructing levee repairs with the understanding that the Levee District in turn would tender that right to the United States Army Corps of Engineers.
Shortly following the commandeering order, excavations on the land were begun, resulting in the taking or removal of 196,-808 cubic yards of soil and clay |2from that portion of Borgnemouth’s property remaining at issue before us. The soil and clay was used in rebuilding and improving the levees. When Borgnemouth demanded compensation for the materials taken, however, the Parish and the Levee District both refused to pay. They primarily claim that the Levee District had already acquired the right to remove the borrow material by virtue of a pre-existing extra-codal servitude,[1] or a /cms-servitude, which, upon the completion of the MR-GO,[2] had been appropriated by the Levee District between 1967 and 1969. Both political subdivisions of the State also resisted any payment to Borgnemouth on other legal theories.
Ultimately, following a trial based upon joint stipulations and deposition testimony, the district court rendered judgment in favor of Borgnemouth and against the Parish and the Levee District in solido, finding that Borgnemouth was the owner of the borrow material and that it was entitled to be compensated for the taking of the material at a rate of $5.00 per cubic yard as well as for its attorney’s fees. The Parish and the Levee District both suspen-sively appeal to us.
We have reviewed the Levee District’s 1967-1969 resolutions, upon which it relies to establish this extra-codal servitude on *896 Borgnemouth’s property, as well as the letters from the Corps of Engineers requesting that the Levee District obtain rights-of-way to facilitate the initial construction of the MR-GO levees. Upon our de novo review, we conclude as a matter of law that the Levee District did not obtain any real rights under its 1967-1969 servitude appropriations to subsurface | osoil and clay and that the trial judge correctly ruled that the Parish and the Levee District must pay just compensation to Borgnemouth for the taking of those materials.
We also conclude that the trial judge was not clearly wrong in his factual determinations that the highest and best use of the Borgnemouth property was as a borrow pit and that $5.00 per cubic yard was the appropriate measure for compensation. Finally, we conclude that the trial judge did not abuse his considerable discretion in the award of attorney’s fees to Borgne-mouth.[3]
We explain our decision in greater detail in the following Parts.
I
In this Part we begin by generally describing the ownership rights of a landowner such as Borgnemouth. At the outset we highlight that Borgnemouth does not contest for the purposes of its claim for compensation the legality of the Levee District’s 1967-1969 resolutions or the parish president’s executive order commandeering its property. Borgnemouth only asserts a constitutional claim to compensation for the 196,808 cubic yards of borrow material taken.
“Ownership is the right that confers on a person direct, immediate, and exclusive authority over a thing.” La. Civil Code art. 477 A. “The owner of a thing may use, enjoy, and dispose of it within the limits and under the conditions 1 established by law.” Ibid. Of course, a tract of land is an immovable which is a thing subject to ownership. See La. Civil Code art. 462.
“Unless otherwise provided by law, the ownership of a tract of land carries with it the ownership of everything that is directly above or under it.” La. Civil Code art. 490 (emphasis added). “The owner may make works on, above, or below the land as he pleases, and draw all the advantages that accrue from them, unless he is restrained by law or by the rights of others.” Ibid.
Thus, based upon these Civil Code provisions, there is no doubt that Borgne-mouth, as the landowner, owns what is directly under its tract of land. Moreover, there are provisions of the Mineral Code which are applicable to the matter of the below-surface soil, supplement the provisions of the Civil Code, and illuminate our decision. See La. Min.C. art. 2. In particular for our purposes, the Mineral Code is applicable “to rights to explore for or mine or remove from the land the soil itself, gravel, shells, subterranean water, or other substances occurring naturally in or as a part of the soil or geological formations on or underlying the land.” La. Min.C. art. 4. See also La. Min.C. art. 4 cmt. (“Thus, it is undesirable that a right to remove gravel, shells, sand, or clay remain outstanding against the land except under the terms of the [mineral] code.”); Continental Group, Inc. v. Allison, 404 So.2d *897 428, 485 (La.1981) (the word “minerals” “embrace[s] the soil itself’). And, generally, “the owner of land may protect his rights in minerals against trespass, damage, and other wrongful acts of interference by all means available for the protection of ownership.” La. Min.C. art. 12.
|sAnd if property such as the soil itself or clay is taken by a political subdivision, such as the Parish or the Levee Board,[4] for public purposes, such as the construction of a levee, just compensation must be paid to the owner. See La. Const, art. 1, § 4(B)(1). And the owner is entitled to be “compensated to the full extent of his loss” which includes “the appraised value of the property.” La. Const. art. 1, § 4(B)(5).[5]
Before the taking involved in this case, the Parish invoked the Louisiana Homeland Security and Emergency Assistance and Disaster Act.[6] The parish president then exercised his authority under the Disaster Act to “commandeer or utilize any private property if he finds this necessary to cope with the local disaster.” La. R.S. 29:727 F(4). Notably, such authority is “[s]ubject to any applicable requirements for compensation.” Ibid. The executive order itself did not take full ownership of the commandeered land but reserved to landowners “as such rights and privileges in said land as may be used without interfering with or abridging the rights hereby acquired.” The executive order provided that the Parish was acquiring an “assignable right and easement to clear, borrow, excavate and remove soil, dirt, and other materials from said immovable property.” (emphasis added) The Parish then assigned an irrevocable right of entry to the Levee District for its use “in obtaining borrow, access and construction of said levee repairs and rehabilitation.” The Levee District then authorized the Corps of ^Engineers to exercise the rights acquired by the commandeering order with the provision that the owners of the commandeered property shall be compensated by the Levee District “in accordance with Louisiana State law.”
To this point, it is clear that Borgne-mouth would be the owner of the soil and clay under its tract of land and that it would be entitled to just compensation for the borrowing of its minerals by these political subdivisions. The executive order did not purport to acquire ownership of the property subject to the commandeering order. Thus, in order to not pay compensation to Borgnemouth for its minerals, the Parish or the Levee Board would have to establish that at least one of them had already acquired the right to these minerals. Because only the Levee District contends that it acquired such a right under its 1967-1969 resolutions, we turn in the next Part to examine that claim.
II
The Levee District forthrightly acknowledges that it was not entitled to appropriate any servitude on Borgnemouth’s property because the MR-GO levee was not constructed on riparian ground and the servitude extended further inland than the landside toe of the levee. Cf La. Civil Code art. 665 (codifying the ancient servitude for the making and repairing of levees on riparian grounds); La. R.S. 38:301 C(1)(a) (providing that “[a]ll lands, exclusive of batture, and improvements hereafter actually taken, used, damaged, *898 or destroyed for levee or levee drainage purposes shall be paid for at fair- market value to the full extent of the loss.”); 7DeSambourg v. Bd. of Comm’rs for Grand Prairie Levee Dist., 621 So.2d 602, 609-611 (La.1998) (defining the scope of a levee servitude under Article 665 to include the levee itself and the “batture,” alluvial accretions annually covered by the ordinary high water mark). See also id. at 606 (explaining that takings involving levee servitudes do “not offend the Fifth and Fourteenth Amendments to the United States Constitution when the servitude is administered impartially since title to riparian lands have been burdened with the legal servitude for levee ... use from the time those lands were separated from the public domain”).
The Levee District instead relies upon the St. Julien doctrine, which provides that because Borgnemouth did not object to any of its appropriations of Borgnemouth’s property during the period of 1967 through 1969, the Levee District cannot be dispossessed of its occupancy. See St. Julien v. Morgan La. & Tx. R.R. Co., 35 La.Ann. 924 (1883). Because Borgnemouth does not seek the eviction or ejection of the Levee District, we need not concern ourselves with the interesting, to say the least, recent history of that doctrine.[7]
| sSince the Levee District did not acquire a codal servitude, either by operation of law or by conventional agreement, we refer to the rights acquired in and to Borgnemouth’s property as a faux-servi-tude. And, for our purposes, we need only focus on what real rights the Levee District did acquire when it appropriated the MR-GO levee /ame-servitudes by virtue of Borgnemouth’s acquiescence to the 1967-1969 takings. We have before us the three resolutions of the Levee District by which the appropriations were effected as well as a corresponding letter of request from the Corps of Engineers preceding the adoption of each resolution.
The letters from the Corps of Engineers spurred the appropriation of land by the Levee District for construction of the hurricane protection levee along the MR-GO. The letters describe the dimensions needed for “the right of way” for levee purposes as well as temporary spoil easements or a temporary ponding area for the collection of debris. The letters make no mention whatsoever about exploiting the land for soil or clay to construct the levee.
Each of the Levee District’s resolutions is co-extensive with the respective, preceding letter from the Corps of Engineers. They each make available a right of way and grant a right of entry and “appropriate said levee rights of way and temporary *899 spoil easements.” All of the resolutions are silent about exploiting the land for soil or clay to construct the levee.
From our reading of these documents by which portions of Borgnemouth’s land was appropriated by the Levee District, we find that the servitude provisions of the Civil Code, which would have been applicable but for the fact that MR-GO 19is not a natural waterway and thus Borgnemouth’s land is not riparian, inform us of the customs and intentions both of the Corps of Engineers in requesting the right of way and the temporary spoil easements and of the Levee District in granting them.
“Servitudes imposed for the public or common utility relate to the space which is to be left for the public use by the adjacent proprietors on the shores of navigable rivers and for the making and repairing of levees, roads, and other public or common works.” La. Civil Code art. 665 (emphasis added). “Affirmative servi-tudes are those that give the right to the owner of the dominant estate to do a certain thing on the servient estate.” La. Civil Code art. 706 (emphasis added). A servitude of right of way is, for example, an affirmative servitude. See ibid.
Nothing in the letters from the Corps of Engineers or in the resolutions of the Levee District suggest an intent to appropriate greater rights than the rights obtained under the codal law of servitudes. And, resorting to application of the Civil Code by analogy, we recall that “[d]oubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate.” La. Civil Code art. 730.
Also, we find that Article 730 is an appropriate guide to be applied here because, as Justice Knoll has importantly noted, “the power of the State and private entities authorized by law to take property competes with the sacred and fundamental rights of citizens to own, control, use, enjoy, protect, and dispose of property.” Exxon Pipeline Co. v. Hill, 00-2535, p. 18 (La.5/15/01), 788 So.2d 1154, 1166 (Knoll, J., concurring) (emphasis added).
|inThus here, for the benefit of the public, the Levee District has a real right for making and repairing of the levee and a right of way to do a certain thing (but no more) on Borgnemouth’s property, which in this instance granted a right of way for entry as well as temporary spoil easements.
Undoubtedly, this includes the right to drive across, leave equipment on, repair, and police the levee. See La. Civil Code art. 744 (allowing the owner of the dominant estate to make all works “necessary for the use and preservation of the servitude”); La Civil Code art. 745 (granting “[t]he owner of the dominant estate ... the right to enter with his workmen and equipment into the part of the servient estate that is needed for the construction or repair of works required for the use and preservation of the servitude ... [and even allows him to] deposit materials to be used for the works and the debris that may result ... ”). Under a right of way servitude, the Levee District, as the dominant estate, would have been permitted to perform all acts in conformity with constructing, maintaining, and operating a levee. See La. Civil Code art. 743 (“Rights that are necessary for the use of a servitude are acquired at the time the servitude is established.”). The Levee District, however, must perform all work in furtherance of its servitude at its own expense. See La. Civil Code. art. 744.
Borgnemouth, as the owner of the ser-vient estate, would “not [be] required to do anything.” La. Civil Code art. 651. Borgnemouth’s sole obligation would have been to permit something to be done on its *900 estate. See ibid. See also La. Civil Code art. 651 cmt. (d) (“Predial servitudes involving toleration of certain activities | non the servient estate may be for the use of that estate for certain purposes, for example, in connection with rights of way.... ”).
By giving the letters and resolutions them generally prevailing meaning, see La. Civil Code art.2047, we find as a matter of law that the real rights appropriated by the Levee District did not extend to the right to excavate, exploit, mine, or otherwise remove the soil or clay owned by Borgnemouth.
Moreover, we are reinforced in this view by the lack of any evidence that the Parish, the Levee District, or even the Corps of Engineers ever (prior to the 2005 commandeering order) excavated or removed Borgnemouth’s minerals, including its soil and clay. There is then no factual basis to support the Levee District’s argument that the right to the minerals was necessary for the use of the rights obtained by appropriation orders and by Borgnemouth’s earlier acquiescence.
Because we conclude that the real rights acquired by the Levee District at the time of its appropriation of a portion of Borgne-mouth’s property did not include or extend to the right to excavate or remove the soil and clay, whether the landowner was compensated or not, it is not necessary for us to consider the Levee District’s alternative argument that Borgnemouth’s right to seek compensation for the appropriations in the 1967-1969 period is prescribed.[8]
We turn now to address the trial judge’s valuation of the material taken.
J12III
In this Part we review the trial judge’s assessment of the amount of Borgne-mouth’s loss for which it is entitled to full compensation. There are three components to this inquiry. The first is the trial judge’s factual finding that the highest and best use of the property taken was as a borrow pit and thus measuring Borgne-mouth’s loss by the cubic yard; we review this finding under the “clearly wrong” standard. The second is the trial judge’s damage award which is based upon a $5.00 per cubic yard value; we review this finding too under the “clearly wrong” standard. The third is the award itself, based upon the two previous factual determinations; we review the award under an abuse-of-discretion standard.
A
The Parish and the Levee District challenge the trial judge’s finding that the “highest and best use” of Borgnemouth’s land was as a “borrow pit,” rather than for recreation or conservation. A borrow pit is “an excavated area where material (as earth) has been borrowed to be used as fill at another location.” WebsteR’s ThiRD New International Uanbridged Dictionary, 257 (Philip Babcock Gove et al eds, 1976). That determination is a factual finding and, as we have stated, we apply a manifest error standard of review. See West Jefferson Levee Dist. v. Coast Quality Constr. Corp., 93-1718, pp. 23-24 (La.5/23/94), 640 So.2d 1258,1277-1278.
“The highest and best use” doctrine strives to fix the value of property “before the contemplated improvement was proposed, without deducting therefrom 11sany general or specific benefits derived by the owner from the contemplated improvement or work.” La. R.S 19:9. *901 Thus, a trial judge must determine the fair market value of a property prior to expropriation or appropriation. “Fair market value” is “the price a buyer is willing to pay after considering all of the uses that the property may be put to where such uses are not speculative, remote or contrary to law.” Hill, 00-2535, p. 8, 788 So.2d at 1160, citing Coast Quality, 93-1718, p. 16, 640 So.2d at 1273.
In determining fair market value “consideration is to be given to the most profitable use to which the land can be put to use by reason of its location, topography, and adaptability.” Id. In order to make this determination, a trial judge should also consider market demand, proximity to areas already developed in a compatible manner with the intended use, economic development in the area, specific plans of businesses and individuals, including action already taken to develop the land for that use, scarcity of land available for that use, negotiations with buyers interested in the property for that particular use, absence of offers to buy the property made by the buyers who put it to the use urged, and the use to which the property was being put at the time of the taking. See id. The current use of the property, however, should be presumed to be the highest and best use, and the landowner bears the burden of proving the existence of a different highest and best use based on a potential, future use. See Coast Quality, 93-1718, p. 20, 640 So.2d at 1275.
114Here, the trial judge weighed the testimony of three individuals. First, Bruce Wallis, the President of Borgnemouth, testified that, prior to the removal of the borrow material, the clay in the land had been certified by the Corps of Engineers for future projects. Additionally, Mr. Wallis stated that Borgnemouth had negotiated a contract to sell borrow material located on the property. Second, Christopher Lovelace, a manager of another borrow pit in St. Bernard Parish, stated that his company regularly bought borrow material from neighboring properties; that, at the time, they were soliciting contracts for market price; and that the location of the Borgnemouth’s property was extremely ideal. Finally, Richard Murphy, a real estate appraiser, found that the land had little development potential.
Notably, the Parish at the time of the commandeering chose not to appropriate full ownership of the property but limited its taking to the removal of the soil and clay. These soil materials were owned by Borgnemouth and were insusceptible of ownership apart from the land until reduced to possession. See La. Min.C. art. 5. As owner, Borgnemouth ordinarily would determine whether and how to reduce to possession the minerals owned by it. See La. Min.C. art. 8.
Thus, the trial judge must have given greater weight to the testimony of Mr. Wallis and Mr. Lovelace in finding that the property’s “highest and best use” was as a “borrow pit.” This is a reasonable finding, and it is not clearly wrong.
Based upon that finding, the trial judge almost necessarily used a method of valuation appropriate to valuing the material removed from the soil; the industry | ir,standard, according to the expert testimony, is to measure the number of cubic yards of material removed or borrowed from the pit. Furthermore, this method of valuation was especially apt because, as we have already remarked, the order commandeering Borgnemouth’s property was not taking the land in full ownership but simply granting access to obtain borrow material. We thus find that there existed a reasonable factual basis for the trial judge’s determination of the highest and best use and that it is not clearly wrong. *902 Nolan v. Mabray, 10-0378, pp. 9-10 (La. 11/30/10), 51 So.3d 665, 672.
B
The Parish and the Levee District also challenge the trial judge’s valuation of the land at five dollars per cubic yard. This is also a factual finding; as such, we again apply the “clearly wrong” standard of review. See id. Here, Mr. Lovelace testified that the range of valuation for borrow material in the St. Bernard Parish area was between four and six dollars. Mr. Wallis then testified to a similar range of value for a cubic yard of borrow material. Finally, Cary Des Roches testified as well that landowners in the St. Bernard Parish area were receiving between $4.25 and $5.00 per cubic yard of borrow material. No testimony was offered by the Parish or the Levee District to contradict these valuations. The trial judge clearly did not err in finding that this valuation was appropriate.
C
Applying this methodology, the trial judge awarded $984,040 to Borgnemouth for the material which was commandeered and taken. Because we 11fidiscern no distinction between the damages owed to a landowner whose property was appropriated or expropriated, we review the damage award here under an abuse-of-discretion standard. See Frank Maraist, 1A La. Civ.L. Treatise, Civil Procedure-Special Proceedings § 9.9 (1st ed.) (Usually the taking of private property for public use involves a judicial declaration and is called an expropriation or a condemnation action; where, however, private property is taken without a prior judicial proceeding, the taking is called “inverse condemnation” or appropriation); State through Dept. of Transp. and Dev. v. Estate of Davis, 572 So.2d 39, 45 (La.1990) (“In expropriation proceedings, much discretion is granted to the trier of fact.”).
Under this standard of review, we defer to the trial judge’s exercise of his considerable discretion. Here, the Parish and the Levee District have not claimed that the trial judge based his decision upon an erroneous view of the law or on a clearly erroneous assessment of the evidence which would necessitate us finding that he had abused his discretion. See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). And we conclude that the award was within the trial judge’s discretion and will not reduce it.
IV
In this Part we review the trial judge’s award of attorney’s fees. The trial judge awarded overall attorney’s fees of $335,370 to Borgnemouth in accordance with the 27% contingency fee contract between it and its lawyers.[9] The Parish and |17the Levee District contend that this award was unreasonable. We disagree. We review these claims under an abuse-of-discretion standard and decline to modify such awards on appeal unless that standard is met. See Covington v. McNeese State Univ., 12-2182, p. 6 (La.5/7/13), 118 So.3d 343, 348.
In Louisiana, the prevailing party may not recover attorney’s fees except where authorized by contract or statute. Rivet v. State, Dept. of Transp. and Dev., 96-0145, p. 10 (La.9/5/96), 680 So.2d 1154, 1160. Here, La. R.S. 13:5111 provides that a trial judge rendering a judgment for a plaintiff against a political subdivision for a taking of property, “other than through an expropriation proceeding, shall deter *903 mine and award to the Plaintiff ... reasonable attorney fees actually incurred because of such proceeding.” Thus, the award of an attorney’s fee to Borgnemouth was statutorily-mandated; we need only determine whether the amount of the attorney’s fee award is reasonable.
Attorney’s fees should be awarded on a case-by-case basis after examining numerous factors. Covington, 12-2182, p. 6, 118 So.3d at 348. The Louisiana Supreme Court has set out factors to be considered by a court in determining the reasonableness of an award of attorney’s fees: (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) amount of money involved; (5) extent and character of the work performed; (6) legal knowledge, attainment, and skill of the attorneys; (7) number of appearances made; (8) intricacies of the facts involved; (9) diligence and skill of counsel; and (10) the court’s own knowledge. See State, Dept. of Transp. and Dev. v. Williamson, 597 18So.2d 439, 442 (La.1992). A court may consider a contingency contract as well, but is not bound by such an agreement in determining reasonable attorney’s fees. See Rivet v. State, Dept. of Transp. & Dev., 01-0961, p. 6 (La.11/28/01), 800 So.2d 777, 782.
Here, the trial judge had the most familiarity with the issues involved in this appropriation matter and the time, diligence, and skill of the attorneys pursuing just compensation for Borgnemouth in the face of unyielding resistance on the part of the political subdivisions to acknowledge any liability. We are not persuaded by the arguments of the Parish and Levee District which rely upon other fact-specific cases to support a finding that the attorney’s fee award is excessive or unreasonable.[10] This case is sufficiently difficult and the attorneys highly skillful (on all sides) that we are unable to conclude that the trial judge abused his considerable discretion by awarding excessive or unreasonable fees.
V
In this Part we address three further arguments made by the political subdivisions seeking to avoid payment of compensation, which arguments we have not yet addressed.[11] The first argument is that, as a matter of law, the MR-GO levee is a federal, not state, project and that compensation to Borgnemouth is a solely federal obligation. The second, alternative argument is that, as a matter of contract, the Parish and the Levee District have been relieved of any obligation to | ^compensate Borgnemouth for the appropriation of its soil and clay because they were mere conduits and that the Corps of Engineers is the sole responsible party. And the third argument, made by the Parish only, is that agreements among the Parish, the Levee District, and the Corps of Engineers constitute stipulations pour autrui, relieving the Parish of any liability to Borgnemouth. We treat them in turn.
A
The Parish and the Levee District contend that no action for this taking exists under La. Const. art. 1, § 4 because the levee reconstruction project was feder *904 al in nature due to the Corps of Engineers’ involvement. See, e.g., Cooper v. City of Bogalusa, 195 La. 1097, 198 So. 510 (1940). Thus, the action would instead arise under U.S. Const, amend. 5. “[T]he issue of whether a particular entity has taken property within the meaning of the Constitution is to be decided on the facts of the individual case.” Holzenthal v. Sewerage & Water Bd. of New Orleans, 06-0796, p. 15 (La.App. 4 Cir. 1/10/07), 950 So.2d 55, 66.
Here, the taking of Borgnemouth’s property, however, was effected under state law, La. R.S. 29:721 et seq., by a state political subdivision in order to repair a levee governed, operated, and maintained through a non-codal or/am-servitude; the federal government, as is clear from all of the documentary evidence from 1967-1969 as well as 2005-2007 did not take title or any servitudes in connection with the repair and construction of the MR-GO levees. The federal government alone, we have said, has exclusive jurisdiction and control over the MR-GO channel. See Vuljan v. Bd. of Comm’rs of Port of New Orleans, 170 So.2d 910, 20911 — 912 (La.App. 4th Cir.1965). Responsibility for the ongoing maintenance and repair of the MR-GO levees remained with the Levee District. See, e.g., Danziger v. U.S., 93 F.Supp. 70, 72 (E.D.La.1950) (rejecting a claim that the federal government instead of the levee district owed compensation, the court noted that it was clear “that the Pontchartrain Levee District and not the United States of America appropriated the necessary rights of way in connection with the construction of the Diamond Levee Setback.”).
We are aware that in cases similar to ours the United States of America was sought to be made a party and removed the cases to federal court. The federal district courts, finding that the only claims were those for indemnity (see Part V-B, post), dismissed the United States as a party, finding that the indemnity claims were premature, and remanded the cases to the state court. See Olivier Plantation, LLC v. St. Bernard Parish, 744 F.Supp.2d 575, 584-585 (E.D.La.2010) (holding that a “determination of whether the Defendants’ actions constituted a taking under the Louisiana Constitution does not implicate any issues of federal law, and thus, does not provides a basis for [a federal district] court to exercise federal subject matter jurisdiction.”); Pizani v. St. Bernard Parish, unpub., 2013 WL 1403317 (E.D.La.2013). (For further discussion, see Pizani v. St. Bernard Parish, 12-1084 (La.App. 4 Cir. 9/26/13), 125 So.3d 546.)
Thus, we conclude that the political subdivisions have not established that the MR-GO levee repairs were a federal project which would relieve them, as a matter of law, from compensating Borgnemouth.
21B
Next, the Parish and the Levee District claim that they should not shoulder any liability to compensate Borgnemouth for this taking after the Corps of Engineers contractually undertook the obligation to pay just compensation to those affected property owners. We disagree and find that this agreement is simply an agreement to indemnify the Parish and the Levee District. “Indemnity means reimbursement, and may lie when one party discharges a liability which another rightfully should have assumed.” Reggio v. E.T.I., 07-1433, p. 6 (La.12/12/08), 15 So.3d 951, 955 (internal punctuation omitted). “An indemnity, or hold harmless, agreement is a contract whereby a party, called the indemnitor, agrees to protect another, called the in-demnitee, against damages incurred by the latter as a result of his breach of a duty *905 owed to a third party.” Saul Litvinoff, 6 La. Civ. L. Treatise, Law of Obligations § 11.27 (2nd ed.). “Thus, the parties to a contract containing an indemnification provision may adjust or allocate the risk of loss or damage that may arise in the performance of their respective obligations.” Scarberry v. Entergy Corp, 13-0214, p. 45 (La.App. 4 Cir. 2/19/14), 136 So.3d 194, 221, wrii denied.
Here, the Parish, the Levee District, and the Corps of Engineers undoubtedly formed an agreement to indemnify. See, e.g., Pizani, 12-1084, pp. 9-10, 125 So.3d at 553. The Corps of Engineers agreed to “identify and pay” affected landowners. The proper parties to this suit, however, remain the Parish and the Levee District. | ga“An indemnitor is not liable under an indemnity agreement until the indemnitee actually makes payment or sustains loss.” Suire v. Lafayette City-Parish Consol. Gov’t, 04-1459, p. 17 (La.4/12/05), 907 So.2d 37, 51 (internal quotations omitted). “An action for indemnity is a separate substantive cause of action, arising at a different time, independent of the underlying” action. Reggio, 07-1433, p. 5, 15 So.3d at 955, but see Pizani, 12-1084, p. 13, 125 So.3d at 555 (holding that third-party indemnity claims are not premature). Here, Borgnemouth’s suit against the Parish and the Levee District is a viable, separate cause of action, and the Corps of Engineers’ agreement to indemnify does not vitiate the Parish and the Levee Districts’ underlying liability for just compensation.
Thus, we conclude that the indemnity agreement does not operate to relieve the political subdivisions of Louisiana from paying full compensation to Borgnemouth and, importantly noting, that the claim for indemnity against the Corps of Engineers is not and cannot properly be before us.
C
Finally, the Parish contends that the agreements consummated between itself, the Levee District, and the Corps of Engineers constituted stipulations pour awtrui, and that this relieves the Parish of liability for providing just compensation to Borgnemouth. The beneficiary in these agreements is certainly Borgnemouth. Borgnemouth, in response, claims that it never manifested any intention to avail itself of the benefits of this agreement, and thus its terms are not enforceable.
12a“Under Louisiana law a contract for the benefit of a third party is called a stipulation pour autrui — translated as a stipulation’ ‘for other persons.’ ” Dugas v. Thompson, 11-0178, pp. 10-11 (La.App. 4 Cir. 6/29/11), 71 So.3d 1059, 1066, citing Joseph v. Hosp. Serv. Dist. No. 2 of Parish of St. Mary, 05-2364, p. 7 (La.10/15/06), 939 So.2d 1206, 1211 n. 5. The Civil Code provides that “[a] contracting party may stipulate a benefit for a third person called a third party beneficiary. Once the third party has manifested his intention to avail himself of the benefit, the parties may not dissolve the contract by mutual consent without the beneficiary’s agreement.” La. Civil Code art. 1978.
“[T]he code has left to the jurisprudence the obligation to develop the analysis to determine when a third party beneficiary contract exists on a case by case basis.” Joseph, 05-2364, p. 8, 939 So.2d at 1212. The Civil Code does provide that “the beneficiary’s intention to accept the benefit may be made known in any manner, even implied.” La. Civil Code art.1978 cmt. (b). Here, however, Borgnemouth has never indicated any intention of accepting this agreement.
Furthermore, even if we were to find that this agreement was enforceable, this agreement only functions as an indemnifi *906 cation. The Parish appropriated Borgne-mouth’s land, making them indebted to Borgnemouth for just compensation for the property taken. The agreements between the Parish, the Levee District, and the Corps of Engineers only function to expand the obligors to this constitutional duty. The Parish cannot circumvent such a duty through stipulations pour autrui.
^CONCLUSION
We conclude as a matter of law that the Levee District did not acquire any real right to the soil and clay belonging to Borgnemouth by virtue of the appropriations of portions of Borgnemouth’s land in the period running from 1967 through 1969 during the construction of the MR-GO levees as the trial judge correctly found.
The Parish commandeered Borgne-mouth’s soil and clay in 2005 to rebuild the storm-damaged levees and assigned its right to enter and take the soil and clay to the Levee District, which exercised the right by assigning it to the Corps of Engineers. As a result the Parish and the Levee District became solidarily liable to Borgnemouth for the taking of its soil and clay, and at the same time Borgnemouth became entitled to just compensation from them to the full extent of its loss.
The trial judge’s factual determinations that the highest and best use of the property was as a borrow pit, that the proper measure of damages was payment by the cubic yard, and that the valuation of $5.00 per cubic yard was appropriate are reasonable and not clearly wrong. And the trial judge did not abuse his considerable discretion in the compensation award of $984,040 or in the attorney’s fee award of $265,948.41.
Finally, we conclude, as did the trial judge, that the Parish and the Levee District are solidarily liable to Borgnemouth to the full extent of its loss and for its statutorily-mandated attorney’s fees.
[^DECREE
We affirm the judgment of the district court in favor of Borgnemouth Realty Company, Ltd., and against the Parish of St. Bernard and the Lake Borgne Basin Levee District, in solido, up to the remaining indebtedness of NINE HUNDRED EIGHTY-FOUR THOUSAND AND FORTY ($984,040.00) DOLLARS, and for attorney’s fees in the amount of TWO HUNDRED SIXTY-FIVE THOUSAND NINE HUNDRED FORTY-EIGHT & 41/100 ($265,948.41) DOLLARS, all with interest, and for all costs of these proceedings, including the costs of the appeal. See La. C.C.P. art. 2164.
AFFIRMED.
McKAY, C.J., concurs in the result.

. See Gumbel v. New Orleans Terminal Co., 186 La. 882, 899, 173 So. 518, 523 (La.1937).

. The acronym for the Mississippi River Gulf Outlet is pronounced "Mister Go.”

. The trial court’s judgment awarded $335,370 in attorney’s fees, but, as a result of settlements, the amount presently in dispute is $265,948.41. Similarly, the total cubic yards taken were initially 248,296; on account of the settlement, the total cubic yards still in dispute have been reduced to 196,808. These revised figures are reflected in the Decree, post.

. See La. Const. art. 6, §§ 1, 38 (recognizing parishes and levee districts as political subdivisions of the State).

. La. Const. art. 1, § 4(G) was added after the taking involved in this case and does not apply on that account.

. La. R.S. 29:721 et seq.

. The Supreme Court prospectively overruled St. Julien in Lake, Inc. v. La. Power & Light Co., 330 So.2d 914 (La.1976). See also City of New Orleans v. New Orleans Canal, Inc., 412 So.2d 975, 977 (La.1981) (holding that Lake only overruled St. Julien prospectively). The Louisiana Legislature responded to this opinion by enacting Act No. 504 of 1976, now codified as La. R.S. 19:14, which conceptually rejuvenated the St. Julien doctrine. The Legislature though failed to explicitly overrule Lake. "Thus, St. Julien is not resurrected; it is merely un-dead, feeding on servitudes established prior to Lake." See A.N. Yiannopoulos, 4 La. Civ.L. Treatise, Predial Servitudes § 6:44 (4th ed.) (italicization added). The legislature has also amended La. R.S. 19:14 in 2007, adding Subsection C, which explicitly prohibits the acquisition of any interest in privately-owned immovable property adjoining or providing access to other property appropriated under the St. Julien doctrine. The legislature, in that amendment, notes that Subsection C is interpretive, remedial, and intended to clarify existing law. We, however, choose not to express a view whether La. R.S. 19:14 C applies retroactively as such a ruling is not necessitated by the instant matter.

. An action for compensation for a taking by a political subdivision prescribes in three years. See La. R.S. 13:5111.

. Because of settlements, the amount still in dispute is $265,948.41.

. The political subdivisions have called our attention to Williamson, 597 So.2d at 439, and SDS, Inc. v. State, Dept. of Transp. and Dev., 07-0406 (La.App. 4 Cir. 2/13/08), 978 So.2d 1013.

. As all of the arguments pose a question of law, each matter is disposed of under a de novo standard of review. See Eagle Pipe and Supply, Inc. v. Amerada Hess Corp., 10-2267, p. 7 (La. 10/25/11), 79 So.3d 246, 256.