# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE                                          NEWS RELEASE #005

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **30th day of January, 2018**, are as follows:

**BY CRICHTON, J.**:

2017-C -0434      ST. BERNARD PORT, HARBOR & TERMINAL DISTRICT v. VIOLET DOCK PORT, INC., LLC   C/W   ST. BERNARD PORT, HARBOR & TERMINAL DISTRICT v. VIOLET DOCK PORT, INC., LLC   C/W   ST. BERNARD PORT, HARBOR & TERMINAL DISTRICT v. VIOLET DOCK PORT, INC., LLC (Parish of St. Bernard)

We affirm the court of appeal's holding that the expropriation was constitutional. However, we reverse the court of appeal's holding on the amount of just compensation due to Violet under art. I, § 4(B)(1), after finding that the trial court made a legal error in its determination of just compensation and the court of appeal failed to correct that error. We therefore remand this matter to the court of appeal solely for the purpose of fixing the amount of just compensation based on the evidence in the record and in accordance with the principles set forth in this opinion.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

WEIMER, J., dissents and assigns reasons.
GUIDRY, J., dissents and assigns reasons.
HUGHES, J., dissents for the reasons assigned by Weimer and Guidry, JJ.

SUPREME COURT OF LOUISIANA

No. 2017-C-0434

**ST. BERNARD PORT, HARBOR & TERMINAL DISTRICT
VERSUS VIOLET DOCK PORT, INC., LLC**

**CONSOLIDATED WITH**

**ST. BERNARD PORT, HARBOR & TERMINAL DISTRICT
VERSUS VIOLET DOCK PORT, INC., LLC**

**CONSOLIDATED WITH**

**ST. BERNARD PORT, HARBOR & TERMINAL DISTRICT
VERSUS VIOLET DOCK PORT, INC., LLC**

**ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
FOURTH CIRCUIT, PARISH OF ST. BERNARD**

**CRICHTON, Justice**

Although the Louisiana Constitution generally restricts the government from expropriating private property, it provides broad exceptions for public port authorities. To Louisiana's maritime industry, public ports are critical. Due to market demands and increasing global competition, public ports must expand in order to compete. The Louisiana Constitution therefore provides that the government can expropriate property for "[p]ublic ports . . . to facilitate the transport of goods or persons in domestic or international commerce." La. Const. art. I, § 4(B)(2)(b)(vi).

We granted the writ in this matter to determine whether St. Bernard Port, Harbor & Terminal District's (the "Port") expropriation of property owned by Violet Dock Port, Inc., L.L.C. ("Violet") on the Mississippi River satisfies the "public purpose" requirement of art. I, § 4(B)(1) of the Louisiana Constitution and, further, whether it violates the business enterprise clause of art. I, § 4(B)(6) of the Louisiana Constitution. For the reasons that follow, we find that the record demonstrates that the Port's expropriation was for the public purpose "to facilitate the transport of

1

goods or persons in domestic or international commerce" and not for the constitutionally prohibited purpose of operating Violet's enterprise or halting competition with a government enterprise. We therefore affirm the court of appeal holding that the expropriation was constitutional. However, we also find the trial court made a legal error in setting the just compensation due to Violet under art. I, § 4(B)(1), and further find that the court of appeal failed to correct that error. We therefore remand this matter to the court of appeal solely for the purpose of fixing the amount of just compensation based on the evidence in the record and in accordance with the principles set forth in this opinion.

## BACKGROUND

Maritime trade is a primary mode of transport for national and international commerce. In the last century, the maritime industry has expanded and modernized. This includes advancements such as containerization and other improvements that have ushered in super tankers and mega ships. In other words, more and larger ships now transport greater amounts of cargo. Such advancements have made public ports, like the St. Bernard Port, a virtual necessity. To accommodate these changes, ports must expand and adapt.[1]

The Port, a public cargo facility in St. Bernard Parish,[2] has consistently experienced an increased demand for cargo handling since at least 2001. Through a lease with a Marine Terminal Operator ("MTO"), Associated Terminals, the Port handles several types of cargo, and has remained one of the busiest ports in the

---

[1] *See generally* Brief for Lake Charles Harbor & Terminal District, Greater Baton Rouge Port Commission, Plaquemines Port, Harbor and Terminal District, Board of Commissioners of the Port of New Orleans, Greater Lafourche Port Commission, Madison Parish Port Commission, Terrebonne Port Commission, Greater Krotz Springs Port Commission, the Port of South Louisiana, the Vinton Harbor & Terminal District, West Calcasieu Port, Caddo-Bossier Parishes Port Commission and Lake Providence Port Commission as Amici Curiae Supporting Respondents St. Bernard Port, Harbor & Terminal District at 4-6 (collecting sources).

[2] The Port is a deep-water public port and a political subdivision of the State of Louisiana. La. R.S. 9:1102.1; 34:1701, *et seq.* The Legislature has given the Port's board the power to develop, maintain, and promote the commerce and traffic of the port district within St. Bernard Parish, thus facilitating the transport of goods in domestic and international commerce. *See* La. R.S. 34:1703.

country. For example, from 2007-2009, the Port's cargo included 37% of all the ferro alloys imported into the United States, 37% of the barite, 10% of the urea, and 3% of the potash. However, the Port began experiencing a shortage of space, and its customers requested both additional space and a liquid cargo facility. Ultimately, by 2008, the Port was operating at near capacity, and determined that if it could not meet its customers' demands, its operations would suffer. As a result, the Port sought to expand in order to meet these growing needs.

To support its expansion, the Port identified approximately 75 acres of land along the Mississippi River (the "Property"). The Port began, as early as 1985, the arduous process of locating suitable property. Seven or eight different sites were investigated, and factors such as having a nearby railroad and land for ingress and egress of trucks were paramount. Compared to other sites along the river, the Property had many of these critical attributes. The Port determined that the Property's relatively straight segment and deep water could handle large cargo ships better than other sites. Further, there was enough land between the nearby levee and the existing rail line for the Port to place a cargo facility. At other sites, the levee was too close to the rail line, which would require the Port to relocate the rail line in order to build a cargo facility. According to a representative from Associated Terminals, the Port's MTO, there was no other space in St. Bernard Parish where a bulk terminal facility could be constructed on the river.

Violet, a limited liability company, owned the Property. At the date of the expropriation, the Property had five berths, which were used for berthing and mooring vessels (*i.e.*, what a Violet representative described as a "parking lot for ships") and topside repairs.[3] Violet also had a contract with the Military Sealift

---

[3] In 2007, the Property consisted of four docks—three that were inspected and certified by the Navy for layberthing military ships and one that had deteriorated. In early 2010, Violet began constructing a fifth berth that would handle cargo. The construction of this fifth berth began in 2010, several years after Violet initially agreed to sell the Property to the Port.

Command, a civilian branch of the United States Navy (the "Navy"), to layberth and service oceangoing ships. In the ten years before the expropriation, Violet's cargo operations were described as "negligible."

A five-member Board of Commissioners, appointed by the Governor, makes decisions for the Port.[4] In 2007, the Port offered $10 million to purchase the Property, which Violet rejected. In 2008, the parties tentatively agreed to a sale of the property for $14 million. Based on this agreement, in order to purchase and develop the property, the Port applied for funding to the Louisiana Department of Transportation & Development's Port Priority Program. In 2010, the Port was awarded a $15 million grant to acquire the Property.

The Port then had the Property reappraised and, as a result, informed Violet it would pay the newly appraised fair market value of $16 million. Violet rejected the Port's offer, and instead sought $35 million. After this, negotiations failed, and the Port initiated the expropriation proceedings.

## PROCEDURAL HISTORY

The Port initiated this expropriation on December 22, 2010, under the quick-take expropriation provisions of La. R.S. 19:141, *et seq.* and deposited $16 million into the registry of the district court. According to the petition, the expropriation was for the purpose of expanding the Port's current port facilities to handle dry-bulk and liquid-bulk commodities. The petition stated the construction of development of the Property would occur in three phases and take approximately eight to ten years to complete. During that time, the petition stated the Port intended to "enter into a new contract with [the Navy] for its continued use of the Violet Port during Phase I of the acquisition and development of the [Property]." The petition further stated the expropriation would "create jobs and benefits to the citizens of St. Bernard Parish."

---

[4] La. R.S. 34:1702(A).

4

Violet thereafter removed the case to federal court and moved to dismiss the petition for expropriation. Violet's primary basis for alleging federal jurisdiction was under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). *See St. Bernard Port, Harbor & Terminal Dist. v. Violet Dock Port, Inc., LLC*, 809 F. Supp. 2d 524, 529 (E.D. La. 2011) (Vance, C.J.) ("*St Bernard Port Federal*"). Because of Violet's contract with the Navy, Violet argued the Port's expropriation was for an act under color of federal law.[5] *Id.* at 531. However, to trigger federal jurisdiction, Violet needed to prove there was a causal nexus between the expropriation and Violet's federal activity with the Navy contract. *Id.* Chief Judge Sarah Vance rejected this argument, finding that Violet failed to prove this nexus:

> Although Violet asserts that [the Port] is, in fact, expropriating the property primarily to take over performance of its contract with the [Navy], that argument does not explain [the Port's] expropriation of the entirety of Violet's property, as Violet's contract with [the Navy] implicates only one of Violet's five berths and only a fraction of the 70 acres [the Port] seeks to expropriate. Nor has Violet submitted anything, other than its own characterization, to suggest that acquisition of the [Navy] property was the primary motivating cause of this 70 acre expropriation.

*Id.* at 531 (footnote omitted). The federal court remanded the case to state court. *Id.* at 538.

Following remand, the trial court held a hearing to consider the public purpose of the expropriation. The trial court heard testimony, reviewed the evidence, and evaluated the credibility of the witnesses. At the hearing, Violet again argued that the Port's true purpose in expropriating the Property was to take over the Navy lease. The Port contended otherwise. According to the Executive Director of the Port: "As far as the lease with the Navy . . . it's an afterthought. . . . [T]hat's certainly not one of our goals." Similarly, a representative from Associated Terminals, the Port's MTO, stated: "[T]he best news for [us] is that the Navy would leave, because we

---

[5] Section 1442(a)(1) permits removal only when "[t]he United States or any agency thereof . . ." is "sued in an official or individual capacity for any act under color of such office."

want the use of the berth to handle cargo, and that's the best berth, the one that they're [the Navy] presently tied to." He further stated: "We're not in the ship berthing business. We're in the cargo business." In contrast, Violet's representative stated that in the decade before the expropriation it had handled "probably no cargo . . . . There may have been some negligible cargo."

After the hearing, the trial court rejected Violet's argument that the expropriation was for the purpose of taking the Navy lease. In granting the Port's petition, the trial court stated that the Port took the Property to "build and operate a terminal to accommodate transport of liquid and solid bulk commodities into national and international commerce to and from St. Bernard." This judgment was based on the trial court's firsthand credibility determinations after hearing testimony from various witnesses. Among these was of the Port's Executive Director, who testified about the Port's need for space. According to his testimony, the Port's cargo tonnage in the previous ten years had grown sevenfold. Consistent with this evidence, the trial court also stated the expropriation was a "logical extension of port services in St. Bernard." From this ruling, Violet applied for writs of certiorari. Both the Fourth Circuit Court of Appeal and this Court denied Violet's writ applications. *St. Bernard Port, Harbor & Terminal Dist. v. Violet Dock Port, Inc., LLC*, 12-0417 (La. App. 4 Cir. 5/16/12); 12-1122 (La. 5/30/12), 90 So. 3d 419.

The case proceeded to a trial on valuation. The trial court found just compensation to be $16 million.[6] At trial, the Port's experts testified that the highest and best use of the Property was continued layberthing plus limited aggregate operations, valuing the Property at $16 million. Violet's experts maintained that the highest and best use of the Property was as a cargo facility. Violet argued that it

_____

[6] This July 31, 2015 judgment came after a trial, completed piecemeal, beginning on September 24, 2013 and concluding on November 11, 2014.

6

should be compensated between $51 million and $67 million.[7] The trial court rejected the highest and best use and valuation opinions of Violet's experts, citing physical limitations that it alleged rendered the Property unsuitable for very large-scale cargo use, including: (a) water depth at the docks; (b) proximity to school and residential areas; (c) limited amount of uplands available for cargo; and (d) configuration of the Property. Consequently, the trial court found just compensation to be $16 million.

On appeal, a divided court of appeal panel affirmed. As to the Port's petition for expropriation, the majority stated: "Although the authority granted to the ports of Louisiana in the expropriation of private property is exceptionally broad, it is supported by the constitution and statutes of the State." *St. Bernard Port, Harbor & Terminal Dist. v. Violet Dock Port, Inc., LLC*, 16-96, 16-262, 16-331, p.7 (La. App. 4 Cir. 12/14/16) ("*St. Bernard Port I*"), 229 So. 3d 626. In affirming the trial court's just compensation award, the majority found the record supported the trial court's ruling. *Id*. at p.10. It further noted that '[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." *Id*. One judge dissented, finding that the expropriation was unconstitutional. *Id*. at p.15 (Lobrano, J., dissenting). After Violet sought rehearing, the court of appeal denied the request. *St. Bernard Port, Harbor & Terminal Dist. v. Violet Dock Port, Inc., LLC*, 16-96, 16-262, 16-331, p. 7 (La. App. 4 Cir. 2/8/17), -- So. 3d -- ("*St. Bernard Port II*"), 2017 WL 526160.

This Court granted Violet's writ application. 17-0434 (La. 5/26/17), 221 So. 3d 853.

## DISCUSSION

---

[7] To this Court, Violet argued that "just compensation" is $28,764,685.00 or $41,084,000.00, which were values that Violet derived from testimony of the Port's experts, having apparently abandoned the conclusions of its own experts.

Authorization for expropriations by a government body—and important limitations placed upon those authorizations—are found in both the federal and state constitutions. *See South Lafourche Levee Dist. v. Jarreau*, 16-0788, 16-0904, p.8-9 (La. 3/31/17), 217 So. 3d 298, 305, *cert. denied*, 138 S. Ct. 381, -- U.S. -- (10/31/17). More specifically, the Fifth Amendment of the United States Constitution, made applicable to the states pursuant to the Fourteenth Amendment, provides: "No person shall . . . be deprived of life, liberty or property without due process of law; nor shall private property be taken for public use, without just compensation." Likewise, the Louisiana Constitution provides "[p]roperty shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation . . . ." La. Const. art. I, §4(B)(1). Therefore, under both Constitutions, any expropriation must be for a "public purpose" *and* provide "just compensation."

To review these determinations, we start with the constitutional provisions at issue. *Arrow Aviation Co., L.L.C. v. St. Martin Parish Sch. Bd. Tax Sales Dept.*, 16-1132, p.4 (La. 12/6/16), 218 So. 3d 1031, 1035 ("When a constitutional provision is plain and unambiguous and its application does not lead to absurd consequences, its language must be given effect."). We then review the record to determine whether the trial court's factual findings were manifestly erroneous. *See Exxon Mobil Pipeline Co. v. Union Pac. R. Co.*, 09-1629, p.12 (La. 3/16/10), 35 So. 3d 192, 200 ("Whether the expropriator's purpose is public and necessary is a judicial determination that will not be reversed on appeal absent manifest error.").

### *Public Purpose*

In 2005, the United States Supreme Court decided the case *Kelo v. City of New London*, 545 U.S. 469 (2005) which expressly upheld a taking for economic development purposes.[8] Following *Kelo*, in 2006, voters of Louisiana approved a

---

[8] In *Kelo*, the Supreme Court held that the city of New London's proposed development plan to revitalize an economically distressed city, including its downtown and waterfront areas, qualified as a "public use" within the meaning of the Takings Clause of the Fifth Amendment to the United

constitutional amendment enumerating permissible "public purposes" for a political subdivision to expropriate private property. As amended, art. I, § 4 provides, in pertinent part:

> Section 4. (A) Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.
>
> (B)(1) Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. Except as specifically authorized by Article VI, Section 21 of this Constitution property shall not be taken or damaged by the state or its political subdivisions: (a) for predominant use by any private person or entity; or (b) for transfer of ownership to any private person or entity.
>
> (2) As used in Subparagraph (1) of this Paragraph and in Article VI, Section 23 of this Constitution, "public purpose" shall be limited to the following:
>
> * * *
>
> (b) Continuous public ownership of property dedicated to one or more of the following objectives and uses:
>
> * * *
>
> (vi) ***Public ports and public airports to facilitate the transport of goods or persons in domestic or international commerce***.
>
> * * *
>
> (6) No business enterprise or any of its assets shall be taken for the purpose of operating that enterprise or halting competition with a government enterprise. . . .

(Emphasis added.)

In other words, the Louisiana Constitution expressly includes "public ports" as an enumerated "public purpose." Specifically, a public purpose is defined as "[p]ublic ports . . to facilitate the transport of goods or persons in domestic or international commerce." La. Const. art. I, § 4(B)(2)(b)(vi).[9]

---

States Constitution.

[9] Public ports are granted additional constitutional authorization to expropriate property for the development of port facilities. Under art. VI, § 21(A), public ports can acquire land through expropriation and lease that land. This permits public ports to lease the expropriated property to

Consistent with the authority given to public ports to expropriate property, the trial court made a factual determination that the Port's purpose for expropriation was to "build and operate a terminal to accommodate transport of liquid and solid bulk commodities into national and international commerce to and from St. Bernard." This purpose falls squarely within the constitutional definition of "public purpose" for public ports. La. Const. art. I, § 4(B)(2)(b)(vi). Based on the record before us, we cannot say that the trial court's finding was manifestly erroneous, and we therefore affirm the finding that this expropriation was for a public purpose. We also find that this expropriation satisfies the broad definition of public purpose under federal law. *See Kelo*, 545 U.S. at 479 ("Without exception, our cases have defined that concept broadly, reflecting our longstanding policy of deference to legislative judgments in this field.").

### *Business Enterprise Clause*

Violet also argues that, even if there was a "public purpose" here, the expropriation violates La. Const. art. I, § 4(B)(6), known as the "business enterprise clause." The legislature did not change this provision as part of the 2006 amendments. La. Const. art. I, § 4(B)(6) states:

> (6) No business enterprise or any of its assets shall be taken *for the purpose of* operating that enterprise or halting competition with a government enterprise. However, a municipality may expropriate a utility within its jurisdiction.

(Emphasis added.)

The business enterprise clause requires the court to determine if the expropriation was "for the purpose of" operating an enterprise or halting competition with a government enterprise. On this point, the court of appeal majority held that the trial court was not manifestly erroneous in holding that the business enterprise

---

another entity that physically handles the operations—a standard practice in the maritime industry. *See also* La. Const. art. I, § 4(H)(1) (exempting "leases or operation agreements for port facilities" from the general prohibition in art. I, § 4(H)(1) that prohibits the State and its political subdivisions from selling or leasing property which has been expropriated).

clause does not apply here from a *factual* standpoint. Violet contests this holding, contending that the Port's expropriation was either to take Violet's revenue stream from the Navy lease or to halt competition with Violet's cargo operations, which it suggests were growing.[10]

First, Violet argues that the purpose of the Port's expropriation was to take over Violet's revenue stream from the Navy lease. Yet testimony at trial was that the Navy lease was "an afterthought." Testimony further indicated that the "best news" for the Port's operation would be to use the Navy berth to further expand cargo operations. Our conclusion is buttressed by the fact that the lower courts and the federal court rejected similar arguments. *See St. Bernard Port I*, 229 So. 3d at 632 ("Violet Dock argues that the real purpose for the taking was so the Port could continue to operate its layberthing and cargo facility and obtain the Navy contracts in violation of La. Const. art. I, § 4(B)(6). . . . We disagree."); *St. Bernard Port II*, 2017 WL 526160, at *1 (on rehearing) ("[W]e found that the facts and circumstances presented by this case simply did not satisfy the requirements of the restrictions of La. Const. art. I, § 4(B)(6)."); *St. Bernard Port Federal*, 809 F. Supp. 2d at 531 ("Nor has Violet submitted anything, other than its own characterization, to suggest that acquisition of the [Navy] property was the primary motivating cause of this 70 acre expropriation."). We likewise do so here.[11]

Second, Violet argues that the purpose of the Port's expropriation was to halt competition. Though Violet argues its cargo operations were growing, the record

---

[10] Violet also argues, as did the dissenting judge in the court of appeal, that the majority erroneously found the business enterprise clause to be limited by La. Const. art. VI, § 21. In other words, they claim the court of appeal erroneously held that any expropriation falling under art. VI, § 21 is exempted from every provision of art. I, § 4(B). But the majority never made such a holding, instead making a factual determination regarding the purpose for the expropriation. To the extent that the court of appeal opinion could be read otherwise, that interpretation is erroneous. *See St. Bernard Port I,* 229 So. 3d at 631-32.

[11] The Port's plan to lease the Property to another entity to operate does not change our analysis. Indeed, the Louisiana Constitution expressly anticipates such a lease. La. Const. art. VI, § 21(A)(c).

11

shows that Violet's cargo operations were "negligible" and that it did not compete with the Port. Instead, generally speaking, the businesses of Violet and the Port were not comparable. Violet was in the layberthing business; the Port was in the cargo business. The record supports the trial court's conclusion that the Port experienced an increasing demand for maritime cargo operations, was at capacity, and sought to expand its cargo operations.

To review the judgment we examine the entire record, but we will not set aside the trial court's judgment in absence of manifest error. *Rosell v. ESCO*, 549 So.2d 840, 844 (La. 1989). Here, the trial court's judgment followed an evidentiary hearing, where the trial court examined evidence, evaluated the credibility of multiple witnesses, and weighed the probative value of these assertions. As this Court has stated:

> It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.

*Id.* at 844. Based upon our consideration of the record before us, we do not find the trial court's judgment to be manifestly erroneous or clearly wrong. We therefore affirm the lower court's judgment granting the Port's petition to expropriate.

### *Just Compensation*

As noted above, the Louisiana Constitution provides that any expropriation must be for a "public purpose" **and** provide "just compensation." La. Const. art. I, § 4(B)(1). It further states: "In every expropriation or action to take property pursuant to the provisions of this Section, . . . , the owner shall be compensated to the full extent of his loss." La. Const. art. I, § 4(B)(5). There is no specific formula set forth by the Legislature to aid courts in determining the "full extent of loss." The Constitution states only: " Except as otherwise provided in this Constitution, the full

12

extent of loss shall include, but not be limited to, the appraised value of the property and all costs of relocation, inconvenience, and any other damages actually incurred by the owner because of the expropriation." *Id.*[12]

La. R.S. 19:9 provides limited guidance as to how to determine the "full extent of the loss." It states that the basis of the assessment of value of the property to be expropriated "shall be the value which the property possessed before the contemplated improvement was proposed, without deducting therefrom any general or specific benefits derived by the owner from the contemplated improvement or work." La. R.S. 19:9(A). *See also Exxon Pipeline Co. v. Hill*, 00-2535, 00-2559, p.7 (La. 5/15/01), 788 So. 2d 1154, 1159-60.[13] The legislature and courts have developed rules that accept fair market value of the property as a relevant consideration in determining just compensation. *Id. See also West Jefferson Levee Dist. v. Coast Quality Constr. Corp.*, 93-1718 (La. 5/23/94), 640 So. 2d 1258, 1277, *cert. denied*, 513 U.S. 1083 (1995). Fair market value, in turn, has consistently been defined as the price a buyer is willing to pay after considering all of the uses that the property may be put to where such uses are not speculative, remote or contrary to law. *Id.* In assessing the fair market value of an expropriated property, the Court considers the most profitable use to which the land can be put by reason of its location, topography, and adaptability. *Exxon Pipeline*, 00-2535, 00-2559, p.8, 788 So. 2d at 1160. This is known as the "highest and best use" doctrine. *Id.*

Determining the "highest and best use" of land in expropriation cases involves several factors, including scarcity of the land available for that use and the use to which the property was being put at the time of the taking. *Id.* (setting forth various

---

[12] For a discussion of the legal history of this provision, see *Exxon Pipeline Co. v. Hill*, 00-2535, 00-2559, p.6 (La. 5/15/01), 788 So. 2d 1154, 1159.

[13] *See also id.*, 00-2535, 00-2559, p.18, 788 So. 2d at 1165-66 (Knoll, J., concurring) ("Because of the important public policies and fundamental rights involved in expropriation cases, it would be helpful if the Legislature took action to clarify standards for valuation under La. R.S. 19:9.").

factors for courts to consider). *See also State, through the Dept. of Highways v. Bitterwolf*, 415 So. 2d 196, 199 (La. 1982), *State, through the Dept. of Highways v. Constant*, 369 So. 2d 699, 702 (La. 1979). It is "well established" that the current use of the property is presumed to be the highest and best use and the burden of overcoming that presumption by proving the existence of a different highest and best use based on a potential, future use is on the landowner. *Exxon Pipeline*, 00-2535, 00-2559, p.8, 788 So. 2d at 1160. Where a landowner overcomes the presumption, the landowner is entitled to compensation based on a potential use of the property, even though the property is not being so utilized at the time of the taking, provided he can show it is reasonably probable the property could be put to this use in the "not too distant future." *West Jefferson Levee Dist.*, 640 So. 2d at 1273.

In summary, in this case, the use to which Violet was putting the Property at the time of the expropriation—here, layberthing—is presumed to be the Property's highest and best use. Violet may overcome this presumption by demonstrating, by a preponderance of the evidence, that the property could be used in a different, more valuable way, that the potential use is not speculative, and that it could be undertaken in the "not too distant future." *Exxon Pipeline*, 00-2535, 00-2559, p.8-9, 788 So. 2d at 1160-61; *West Jefferson Levee Dist.*, 640 So. 2d at 1273. Here, the trial court found that Violet did not overcome that presumption.

Turning to the standard by which we review the trial court's findings, in an expropriation proceeding, the trial court's factual determination as to the value of the property will not be disturbed in the absence of manifest error. *West Jefferson Levee Dist.*, 640 So. 2d at 1277. "However, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent *de novo* review of the record and determine a preponderance of the evidence." *Evans v. Lungrin*, 97-0541 (La. 2/6/98), 708 So. 2d 731, 735. *See also*

14

*West Jefferson Levee Dist.*, 640 So. 2d at 1278. Legal errors occur when a trial court applies incorrect principles of law and those errors are prejudicial; when such a prejudicial legal error occurs, the appellate court is required to review the record and determine the facts *de novo. Evans*, 640 So. 2d at 735.

Here, we find the trial court used the incorrect standard for evaluating experts' valuation testimony. Explaining why it accepted the Port's expert testimony rather than Violet's, the court stated: "It is the opinion of this Court that it does not have the discretion to 'split the baby' and arrive at a valuation somewhere in between" the two expert opinions. This is erroneous. A trier of fact is not required to make a binary choice and accept one side's testimony in its entirety, but is instead empowered to weigh strengths and weaknesses of expert testimony. To the extent the trial court held otherwise, this is legal error. *See West Jefferson Levee Dist.*, 640 So. 2d at 1277 ("The opinions of experts regarding valuation are advisory and are used only to assist the court in determining the amount of compensation due in an expropriation case."). *See also, e.g., State, Dep't of Transp. & Dev. v. Schwegmann Westside Expressway, Inc.*, 95-1261, p.6-7 (La. 3/1/96), 669 So. 2d 1172, 1176 ("[A] trier of fact does not have to accept in toto the testimony of any one group or group witnesses.").[14] Further, this error was prejudicial to Violet insofar as the trial court set just compensation in the exact amount put forward by the Port's experts.

The court of appeal compounded this error by failing to identify it and conduct a *de novo* review. *St. Bernard Port I*, 229 So. 3d at 634-35 (noting that "we cannot find that the trial court was manifestly erroneous or clearly wrong in its ruling that $16,000,000 was just compensation for the property"). Instead, the court of appeal noted the general proposition that a factfinder has "broad discretion" in determining

---

[14] We note that this does not change the general rule that the trial court has "much discretion in evaluating and determining the weight to be given to each expert." *West Jefferson Levee Dist.*, 640 So. 2d at 1277. But here, the trial court's apparent misconception that he could not "split the baby" was prejudicial to Violet, insofar as it limited what the trial court believed to be just compensation due to Violet under the law.

weight to be given to expert testimony. *Id.* While this is, of course, a correct statement of the law, it overlooks that the trial court was apparently operating under an incorrect belief about the extent of its ability to exercise that broad discretion.

In summary, we find that the lower courts erred in the determination of just compensation. We therefore remand this matter to the court of appeal solely for the purpose of fixing the amount of just compensation based on the evidence in the record and in accordance with the principles set forth in this opinion. *See Gonzales v. Xerox Corp.*, 320 So. 2d 163, 165 (La. 1975) (remand to appellate court, rather than trial court, is appropriate when the appellate court has all the facts before it); *Buckbee v. United Gas Pipe Line Co.*, 561 So. 2d 76, 87 (La. 1990). *See also Exxon Pipeline*, 00-2535, 00-2559, p.18, 788 So. 2d at 1166 (Knoll, J., concurring) ("[V]aluation of property in expropriation cases is an open question and each case should be judged on its own under its individual facts and circumstances. Inadequate and inaccurate valuations run rampant and we must strive to find valuations that serve the purpose of protecting property rights while allowing public interests to be served."). Although this Court, like the court of appeal, has appellate jurisdiction of both law and fact and may perform an independent review and render judgment on the merits, *see* La. Const. art. V, § 5 (C), we prefer that the court of appeal perform the first appellate review of the entire record under the correct rule of law. *Buckbee*, 561 So. 2d at 87.

## CONCLUSION

We affirm the court of appeal's holding that the expropriation was constitutional. However, we reverse the court of appeal's holding on the amount of just compensation due to Violet under art. I, § 4(B)(1), after finding that the trial court made a legal error in its determination of just compensation and the court of appeal failed to correct that error. We therefore remand this matter to the court of

16

appeal solely for the purpose of fixing the amount of just compensation based on the evidence in the record and in accordance with the principles set forth in this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

# SUPREME COURT OF LOUISIANA

## NO. 2017-C-0434

## ST. BERNARD PORT, HARBOR & TERMINAL DISTRICT VERSUS VIOLET DOCK PORT, INC., LLC

### CONSOLIDATED WITH

## ST. BERNARD PORT, HARBOR & TERMINAL DISTRICT VERSUS VIOLET DOCK PORT, INC., LLC

### CONSOLIDATED WITH

## ST. BERNARD PORT, HARBOR & TERMINAL DISTRICT VERSUS VIOLET DOCK PORT, INC., LLC

*ON WRIT OF CERTIORARI TO THE COURT OF APPEAL
FOURTH CIRCUIT, PARISH OF ST. BERNARD*

**WEIMER, J.**, dissenting.

With all due respect, I find the majority opinion unfortunately eviscerates the long, significant history the citizens of Louisiana have embodied within La. Const. art. I, § 4(B)(6) to protect private business from takeover by the government. The majority opinion thereby subjects business interests across Louisiana to increased risk of government takeovers, which has the effect of thwarting private business from initiating economic development that competes with governmental enterprises. While agreeing that the determination of whether the St. Bernard Port, Harbor & Terminal District ("the Port") expropriated the property and port facilities owned by Violet Dock Port, Inc., LLC ("Violet") for the purpose of operating that port facility or halting competition with the Port is, to an extent, fact-based, I find that legal errors committed by the district court interdicted the fact-finding process, necessitating *de novo* review. I additionally find that the perfunctory and, in the end, erroneous,

manifest error review compounds the legal error of the district court, exposing to serious erosion the conscious, concerted efforts to protect private business enshrined in our constitution. Therefore, I respectfully dissent from the majority opinion.

*Historical Background*

While the resolution of this case centers around the meaning and application of a singular provision in the constitution, the historical context should be considered in evaluating this *res nova* issue.

The citizens of Louisiana have long maintained, through the constitutional provisions they ratified, that the situations in which the government can expropriate private property are greatly limited. Providing a guarantee prominently positioned in the second section of the Bill of Rights, the 1921 Constitution indicates: "Except as otherwise provided in this Constitution, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid." La. Const. 1921 art. I, § 2.

With the enactment of the most recent constitution, this protection was enhanced. Under the 1974 Constitution, expropriation requires not merely a "public purpose," but a "public and necessary purpose." La. Const. 1974 art. I, § 4(B). In addition, the amount of compensation owed is not limited to "just and adequate compensation," as in the 1921 Constitution, but expanded to encompass compensation to "the full extent of [the owner's] loss." **Id.** Furthermore, in a provision specifically directed to the issue at hand, a third protection was added. See **id.**

While prohibitions against government engaging in commercial enterprise had been enshrined in constitutions dating back over one-and-a-quarter centuries (see the

2

1879 Constitution),[1] the 1974 Constitution, consistent with its intent to provide increased protection to private interests from governmental takings, added a new prohibition, currently found in La. Const. art. I, § 4(B)(6). This prohibition, which I refer to as the "private business enterprise protection clause," provides in relevant part:

> No business enterprise or any of its assets shall be taken for the purpose of operating that enterprise or halting competition with a government enterprise.

The clause represents "the first provision in any state constitution to prohibit the government from seizing the means of production," Louis Woody Jenkins, *The Declaration of Rights*, 21 Loy. L. Rev. 9, 24 (1975), and evidences a clear and unambiguous choice by the electorate to curtail government efforts to take business property or the business itself.

With the above-detailed protections added to and enshrined in Article I, § 4, the 1974 Constitution "goes beyond other state constitutions, including our 1921 Constitution, and the federal constitution in limiting the power of government to regulate private property." **State v. 1971 Green GMC Van**, 354 So.2d 479, 486 (La. 1977).

However, the citizens of Louisiana did not stop there, demonstrating an adamant and emphatic determination to protect private business from government takeover. When property rights protected by the federal constitution were seemingly eroded by the United State Supreme Court's ruling in **Kelo v. City of New London, Connecticut**, 545 U.S. 469 (2005), the Louisiana electorate responded by enshrining

---

[1] See, e.g., La. Const. 1879, art. 56: "Nor shall the State, nor any political corporation thereof[,] assume the liabilities of any political[,] municipal, parochial, private[,] or other corporation or association whatsoever; nor shall the State undertake to carry on the business of any such corporation or association, or become a part owner therein ...."

3

additional protections in our state constitution. See 2006 La. Acts 851, § 1 (approved September 30, 2006). These protections include a prohibition from taking property "for predominant use by" or "transfer of ownership to any private person," and the inclusion of a more "limited" definition of "public purpose." See La. Const. art. I, § 4(B)(1)(a) and (b); *Id.*, § 4(B)(2). Furthermore, in a rejection of the core holding of **Kelo**, the Louisiana electorate added the following prohibition: "Neither economic development, enhancement of tax revenue, or any incidental benefit to the public shall be considered in determining whether the taking or damaging of property is for a public purpose ...." La. Const. art. I, § 4(B)(3).

As evidenced by the above, Louisiana has a long and storied history of protecting private property interests from undue governmental interference. Nowhere is that strong interest more evident than in the protections extended under La. Const. art. I, § 4(B)(6), protections unique to Louisiana, but entirely consistent with the core principles underlying Louisiana's interest in protecting private property rights.

It is the meaning and application of La. Const. art. I, § 4(B)(6) that is ultimately at issue in this case, an issue which is *res nova* in this court, but not without guidance for its resolution. Foremost among the guiding principles is the dictate that the starting point in interpreting constitutional provisions is the language of the provision itself and that, when the language of a constitutional provision is clear and unambiguous, that language must be given effect. **Louisiana Department of Agriculture and Forestry v. Sumrall**, 98-1587, pp. 4-5 (La. 3/2/99), 728 So.2d 1254, 1258. In this case, no party contends that the language of Article I, § 4(B)(6) is ambiguous or susceptible to multiple interpretations. Therefore, to evaluate the provision, it is not necessary to look behind its clear language. However, for the purpose of placing the constitutional provision in its historical context, it is relevant

4

to note that secondary sources confirm the clear intent behind the words of the enactment.

As explained by Delegate Jenkins, the co-author and floor sponsor of Section 4(B)(6), the provision "was clearly intended to counter what delegates perceived as excessive interference by government in the economy and the growing possibility that government would attempt to take over certain business enterprises." Jenkins, *The Declaration of Rights*, 21 Loy. L. Rev. at 24.[2] Given this purpose, "the provision should be broadly interpreted to prevent both direct and indirect efforts to seize any private industry." *Id.*

Of course, as acknowledged by Delegate Jenkins and as evidenced in its language, the prohibition contained in Section 4(B)(6) is not absolute, and certain expropriations may have the effect of terminating a business enterprise, as, for example, when a highway right-of-way results in the taking of property belonging to a grocery store, causing it to go out of business. *Id.*, 21 Loy. L. Rev. at 25. In such cases, *the purpose of the expropriation is crucial*. *Id.* Pursuant to Section 4(B)(6), "[a]ny effort to use the power of eminent domain to take over an existing business or seize its assets in order to create a similar government enterprise or to put an enterprise out of business in order to improve the competitive advantage of a government enterprise is unconstitutional." *Id.*

*The Litigation*

With this historical context in mind, it is appropriate to turn to the instant case in which, using the "quick-take" provisions of La. R.S. 19:141, *et seq.*, the Port

---

[2] Delegate Jenkins's assessment was echoed by another convention delegate, J. Burton Willis, who queried: "Isn't this a case of private enterprise against government ownership?" To which Delegate Jenkins replied: "I think it is." (Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts, vol. VI, 39th day, Aug. 30, 1973, 1048).

expropriated Violet's privately owned port facility. Violet filed a motion to dismiss the petition for expropriation, arguing, among other things, that the taking violated La. Const. art. I, § 4(B)(6). Following an evidentiary hearing, the district court denied the motion to dismiss based on a finding that the taking served a public purpose. In a per curiam issued in connection with that ruling, the district court reasoned:

> Export of goods and commodities through the port is one of the basic industries of St. Bernard Parish. The acquisition of the Violet terminal would be a logical extension of port services in St. Bernard. The port would acquire heavy duty docks and forty two hundred (4200 LF) linear feet of Mississippi River frontage available for immediate use. Thirty eight (38) acres of presently undeveloped uplands would be available for cargo storage. The contemplated construction and use of the property would bring needed revenues into the community which is still recovering from the effects of the 2005 hurricanes and provide needed employment to its citizens. The predominant use for the property would be by the public, not for use by, or for transfer of ownership to any private person or entity. The Court is apprised that the expropriation will not affect the use by MSC ["Military Sealift Command"] for its vessels should MSC elect to continue that use.

*Standard of Review*

The majority opinion maintains that the district court's per curiam represents a determination "that the business-enterprise clause does not apply here from a *factual* standpoint" and, thus, the district court's ruling is subject to manifest error review. **St. Bernard Port, Harbor & Terminal District v. Violet Dock Port, Inc., L.L.C.,** 17-0434, slip op. at 10, 12 (La. 1/30/18) (emphasis in original). I respectfully disagree, believing that a more careful analysis in light of the historical context or "a deeper look at the [district] court's reasons for ruling ... reveals an error in [the] legal analysis, requiring this court to conduct a *de novo* review of the record." See **Bridges v. Nelson Indus. Steam Co.,** 15-1439, p. 4 (La. 5/3/16), 190 So.3d 276, 279.

6

Even a cursory review of the district court's per curiam reveals that it contains no factual findings or legal determination regarding the primary reason cited by Violet for its contention that the taking is unconstitutional–that it violates La. Const. art. I, § 4(B)(6)'s prohibition against the taking of a business enterprise or any of its assets for the purpose of operating that enterprise or halting competition. Indeed the per curiam makes no mention of the private business enterprise protection clause or any factual findings relating thereto. Instead, the per curiam focuses solely on considerations prompted by Section 4(B)(1); *i.e.*, whether the taking is for the predominant use or transfer of ownership to any private entity.[3] Furthermore, it focuses on economic factors–needed revenues and employment–that are **expressly prohibited** from consideration in determining public purpose by Section 4(B)(3).[4]

"The manifest error standard of review assumes that the trier of fact applied the correct law in arriving at its conclusion." **Winfield v. Dih**, 01-1357, p. 8 (La.App. 4 Cir. 4/24/02), 816 So.2d 942, 948. That assumption is not warranted in this case where the district court's reasons reflect that the court's decision was guided by principles that are either irrelevant to the question of whether the taking violated the private business enterprise protection clause, *i.e.*, whether the taking is for the

---

[3] La. Const. art. I, § 4(B)(1) provides:

> Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into the court for his benefit. Except as specifically authorized by Article VI, Section 21 of this Constitution property shall not be taken or damaged by the state or its political subdivisions: (a) for predominant use by any private person or entity; or (b) for transfer of ownership to any private person or entity.

[4] La. Const. art. I, § 4(B)(3) provides:

> Neither economic development, enhancement of tax revenue, or any incidental benefit to the public shall be considered in determining whether the taking or damaging or property is for a public purpose pursuant to Subparagraph (1) of this Paragraph or Article VI, Section 23 of this Constitution.

7

predominant use or transfer of ownership to a private entity;[5] or expressly prohibited from consideration in connection therewith; *i.e.*, whether port expansion will add revenues and jobs to the local community. Because, as was the case in **Bridges**, the district court's reasons focus on factors which are irrelevant to the question presented and (in the instance of economic benefits) prohibited from consideration by the constitution itself, an error in the court's legal analysis is exposed, requiring *de novo* review. See **Bridges**, 15-1439 at 4, 190 So.3d at 279.[6]

By focusing on La. Const. art. I, § 4(B)(1), and its admonition that, except as specifically authorized by La. Const. art. VI, § 21, no property shall be taken for predominant use or transfer of ownership to any private entity, the district court elevated the general language of that provision over the specific language of Article I, § 4(B)(6), making *no* findings with respect to the central issue presented here–whether the taking violates the private business enterprise protection clause. The majority opinion, I believe, falls into similar error. In focusing on the provisions of Article I, § 4(B)(2)(vi), which define a "public purpose" to include expropriation by public ports to facilitate the transport of goods in commerce, the majority opinion elevates this broad general expropriatory authority over the specific qualifying limitation embodied in Section 4(B)(6), in effect untethering the Port's taking authority from the limitation of the private business enterprise protection clause.

---

[5] The majority opinion, in footnote 9, specifically acknowledges the irrelevance of this consideration in the case before this court, pointing out that the prohibition of La. Const. art. I, § 4(B)(1) against taking or damaging property for predominant use by any private person or entity is subject to the exception found in Article VI, § 21(A), which permits public ports to acquire land through expropriation and lease that land to a private entity for management of the operations. **St. Bernard Port**, slip op. at 9 n.9.

[6] In essence, the situation presented here is akin to an improper jury instruction: the district court's per curiam reflects that it improperly instructed itself as to the applicable legal principles, interdicting the fact-finding process and necessitating *de novo* review. See, e.g., **Picou v. Ferrara**, 483 So.2d 915, 918 (La. 1986).

8

However, Section 4(B)(6) is a limitation on the "public purpose" definition of Section 4(B)(2)(vi), and it specifically counsels that the taking of a business enterprise for the purpose of operating or halting competition with that enterprise is not a legitimate "public purpose."

As Delegate Jenkins' comments indicate, the purpose of the expropriation is crucial to the determination of whether there is an unconstitutional taking within the meaning of Section 4(B)(6). In assessing whether the taking is for a purpose consistent with the constitutional strictures of this provision, certain principles of interpretation apply. Because "expropriation proceedings are in derogation of the right of individuals to own property, the law governing these proceedings must be strictly construed against the expropriating authority." **State v. Estate of Davis**, 572 So.2d 39, 42 (La. 1990). This strict construction against the expropriating authority is consonant with the broad interpretation of Section 4(B)(6) urged by Delegate Jenkins, given that Section 4(B)(6) has as its similar aim the protection of private business enterprise against excessive government interference. In addition, "every clause in a written constitution is presumed to have been inserted for some useful purpose, and courts should avoid a construction which would render any portion of the constitution meaningless." **Succession of Lauga**, 624 So.2d 1156, 1166 (La. 1993).

In this case, to the extent it can be argued that the district court made a factual finding with respect to the "purpose" for the expropriation, it appears the court simply accepted at face value the Port's stated reason for expropriating Violet's property without considering the effect of that taking.[7] Such an analysis is constitutionally

---

[7] The per curiam declares: "The St. Bernard Port's stated reason for expropriation was to build and operate a terminal to accommodate transport of liquid and solid bulk commodities into national and international commerce to and from St. Bernard."

9

deficient, as the myopic focus on the Port's stated reason for the expropriation without any examination of the effect of the taking would allow the Port, or any expropriating authority, virtually unfettered authority to expropriate property as long as it professed an ostensible proper motive for the taking. This would be true even if the stated purpose also had the effect of enabling the expropriating authority to take over and operate a private enterprise, or halt private competition, rendering Section 4(B)(6) meaningless.

It is precisely this type of analysis of Section 4(B)(6) that Delegate Jenkins cautioned against when he offered as an example of a taking prohibited by Section 4(B)(6), the expropriation of apartments or rental homes for the purpose of constructing public housing. See Jenkins, *The Declaration of Rights*, 21 Loy. L. Rev. at 25. The parallels to that example are evident in this case. Here, pointing to La. Const. art. I, § 4(B)(2)(b)(vi), which defines "public purpose" to include continuous public ownership of property by public ports "to facilitate the transport of goods ... in domestic or international commerce," the Port seeks to expropriate for the stated purpose of enhancing and expanding its role as a market participant in the port service industry, property belonging to a private participant (Violet) in the same industry. However, this type of taking runs squarely afoul of Section 4(B)(6) and the protection of private enterprise from fear of governmental takeover that this constitutional provision was intended to promote.

Undeniably, public ports have been granted expropriation powers under the constitution to facilitate the transport of goods in commerce. Unquestionably, public ports are significant economic engines, that work to support trade, enable Louisiana's energy and agricultural industries to further enhance the economy, and provide employment and business opportunities to local, regional, and the state's economies.

However, private enterprise does likewise. Ports are granted substantial authority to operate, but ports cannot take over an on-going private business to operate that business or to end competition. In Section 4(B)(6), the people of this state have made a conscious decision to limit governmental interference with private enterprise, and that limitation must be respected. Moreover, it can only be respected (and effectuated) by an examination not only of the stated reasons for expropriation, but of the effect of that taking as well.

*De novo review*

The ultimate question presented in this case is one that is directed by the language of Section 4(B)(6): whether Violet's business enterprise or any of its assets was taken by the Port for the purpose of operating that enterprise or halting competition with the Port enterprises. At the hearing on the motion to dismiss, Violet contended that the Port's taking runs afoul of both prongs of Section 4(B)(6). According to Violet, the Port took its property for the purpose of operating its layberthing enterprise and also for the purpose of operating its docks for bulk cargo in the future (a venture in which Violet had engaged and into which it was expanding), thereby halting competition from Violet. The testimony and evidence on this point was extensive, with both sides presenting opposing views and conflicting testimony. Nevertheless, at the conclusion of the process, certain facts were undisputed.

Violet owned one mile of the ten miles of river-front property within the Port's jurisdiction on which it had constructed a facility consisting of five docks and related infrastructure. For decades, Violet had contracted with the United States Military Sealift Command ("the Navy") to layberth and service ocean-going Navy ships.

11

While layberthing for Navy (and some commercial) vessels was Violet's primary operation, it did perform some repair and cargo operations at its docks.

In 2006, due to a growing demand for cargo services, the Port found itself operating at capacity and in need of expansion. The Port identified Violet's property as being best suited for its expansion needs and contacted Violet to discuss purchasing its property. In 2007, the parties tentatively agreed on a purchase price. To facilitate the purchase, the Port applied for funding through the Louisiana Department of Transportation and Development's Port Priority Program. A Port Priority Application ("PPA") was submitted in 2008 seeking the maximum grant of $15 million to purchase the property. In its application, the Port represented that the Violet property was best and ideally suited for the transfer and storage of dry and liquid bulk commodities, and that development of the property for this purpose would take place in three phases. In a letter submitted in connection with the application, the Port identified the Navy contract and represented to DOTD that "the [P]ort will derive from this proposed project a lease with the Navy/MARAD in the approximate amount of $550,000 per year for Navy/MARAD ships occupying the berths," that it will "continue to compete for these MARAD/Navy contracts," and that "the annual net revenue from the Navy contracts at the Violet site has averaged $550,000 [and] [f]uture contracts are expected to be in that same ... range." In essence, the Port represented that the Navy contract could be figured in to DOTD's required rate of return for funding the project. Based on the Port's representations, DOTD awarded it the requested funding.

Ultimately, the negotiations for the sale of the property were unsuccessful. In the interim, however, Violet continued to operate and commenced efforts to expand its own cargo operations at its facility, obtaining permits to allow more cargo

12

operations and constructing a new berth for cargo use. Violet also entered into an option agreement with Vulcan Materials for lease of the new berth and ten adjoining acres to transload and store aggregate bulk cargo.[8]

In December 2010, the Port filed its petition for expropriation. In that petition, the Port averred that the property was necessary and suitable for bulk cargo operations. It described the plans for the Violet facility as taking place in three phases. The petition identifies the Navy contract and avers that during Phase I of the development, "[t]he St. Bernard Port intends to enter into a new contract with the Military Sealift Command for its continued use of the Violet Port."

Violet filed a motion to dismiss the expropriation proceeding, challenging its public purpose. At the hearing on the motion, the Port offered testimony that Violet's property was the only property in the area suitable for handling large-scale bulk cargo operations. It offered its Port Priority submissions and testimony related thereto. The Port acknowledged that it intended to take over the Navy contract and continue to service the Navy ships on the property for at least 8 to 10 years, although it contended that the contract was an "afterthought" and "not one of our goals." The Port reiterated its three-phase plan for development of the Violet facility, but acknowledged that Phase I, the only phase that was actually funded, was simply to acquire the property and enable Associated Terminals, its Marine Terminal Operator, to occupy and use the site for stevedoring operations.

The district court denied Violet's motion to dismiss the expropriation proceeding, and the case moved to the just compensation trial. By the time of this trial, the Port had contracted with the Navy for continued layberthing at the former Violet site. Ironically, it contended, and the district court found, that the highest and

---

[8] The option expired without being exercised by Vulcan.

best use of the property was not for large-scale cargo operations, as the Port had previously contended when taking the property, but that the highest and best use of the property was layberthing coupled with a limited intermodal container terminal–essentially, a continued use of the property as it was being used by Violet.

Whether viewed at the granular level (focusing on the scope of Violet's layberthing and cargo operations) or at a broader level (focusing on the role of both the Port and Violet as operators of riverfront port facilities), it appears from the foregoing undisputed facts that the Port's taking in this case is unconstitutional within the meaning of La. Const. art. I, § 4(B)(6). The facts establish that the Port obtained $15 million from the state to facilitate the purchase of Violet's property and that it planned to take and use Violet's assets and existing customer revenue (the Navy contract) as interim financing to fund the expansion of cargo operations. The facts likewise establish that while Violet's cargo operations were "negligible," they were not non-existent, and Violet was making its own efforts to expand into the cargo handling arena, in competition with the Port. The PPA, the petition for expropriation, and the testimony at trial all establish that the Port intended to enter into a contract with the Navy for its continued use of the Violet port during Phase I of its port development plan. Thus, while the Port maintains that it was and is not in the layberthing business, the facts disclose that layberthing the Navy ships was an integral part of its plan, it effectuated that plan, and it is still performing layberthing services today, which include the Navy contract.

When a governmental entity takes and uses private business property or assets to generate revenue in ways similar to a private enterprises's prior operations, or when a governmental entity necessarily will use the property or assets as part of its own business plans, that taking is one "for the purpose of operating that enterprise"

14

within the meaning of Section 4(B)(6). Furthermore, when the taking will necessarily allow a governmental entity to increase its market share and prevent a growing or potential competitor from entering into the market or expanding its business, the taking is for the purpose of "halting competition with a government enterprise."

Under the facts in this case, reviewed *de novo*, the district court erred in denying Violet's motion to dismiss the petition for expropriation, as that taking is unconstitutional under Section 4(B)(6).

*Manifest Error Review*

As indicated, ports are extremely important economic engines for the state; this fact is undeniable. However, the people of this State have made a conscious, concerted commitment, at every opportunity (particularly when Section 4(B)(6) was adopted in 1974 and again in 2006 when further restrictions were imposed post-**Kelo**), to protect private ownership against government takeover of the means of private production. It is this longstanding, fundamental constitutional principle that is at stake in this case. Furthermore, while I remain convinced that *de novo* review is warranted due to the errors in the district court's legal analysis, even should the manifest error rule be applied to the factual findings (that the district court clearly did not make), I would find any "factual" determination that the taking in this case was not for the purpose of operating Violet's port facility or eliminating competition from Violet is manifestly erroneous.

Certainly, under the manifest error rule, where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous. **Rosell v. ESCO**, 549 So.2d 840, 844 (La. 1989). However, where documents or objective evidence so contradict a witness's story, or the story itself if so internally inconsistent or implausible on its face that a reasonable factfinder would not credit

the witness's story, a reviewing court may well find manifest error. ***Id.*** at 844-45. Indeed, while deference should be accorded to the factfinder, because appellate courts have a constitutional duty to review both law and facts, they have the right and obligation to determine whether a district court judgment is clearly wrong based on the evidence. <u>See</u> **Ambrose v. New Orleans Police Dept. Ambulance Service**, 93-3099, p. 8 (La. 7/5/94), 639 So.2d 216, 221. This concept is particularly applicable when this court evaluates a *res nova* constitutional issue.

In this case, the uncontradicted *objective* evidence demonstrates the pretextual nature of the Port's *subjective* contention that the taking was not for the purpose of assuming Violet's layberthing operations with the Navy, and that layberthing operations were an "afterthought." This objective evidence–in a nutshell–is found in the Port's PPA submitted to DOTD (in which it represented that the Navy contract could be figured into DOTD's required rate of return for extending funding to the Port), in the petition for expropriation (in which the Port avers that it "intends to enter into a new contract with the Military Sealift Command for its continued use of the Violet Port"), and in the fact that the Port, after the quick-taking, entered into a contract with the Navy and continues to this date to perform the same layberthing operations once conducted by Violet.[9]

The same analysis holds true for the Port's contention that the taking was not for the purpose of eliminating competition from Violet because Violet's cargo operations were "negligible" and the Port was not in the "layberthing" business and thus did not compete with Violet. The objective facts demonstrate that while the Port contends the expropriation was motivated solely by its need to expand its cargo

---

[9] Testimony by Port officials that the Navy could "just sail away" proved incorrect. The Navy has not sailed away in the seven years since the expropriation occurred, and the Port still receives the income Violet previously enjoyed.

16

operations, and that the Violet property was the only property suitable for expansion and creation of a liquid cargo facility, once the taking was effected and valuation was at issue, the Port "flipped the script" and argued that the highest and best use of the property was not for large-scale cargo operations, as it had previously contended, but for layberthing coupled with a limited intermodal container terminal–essentially, a continued use of the property exactly as it was being used by Violet. The *subjective* contention that the taking was not for the purpose of taking over Violet's business enterprise is belied by the *objective* reality of what has occurred.

The facts, as acknowledged in the majority opinion,[10] establish that while Violet had historically not been engaged in large-scale cargo operations, Violet was actively expanding into that area, having constructed a new berth that would handle cargo and having entered into an option contract with Vulcan Materials for lease of the new berth and ten adjoining acres to transload and store bulk cargo. In other words, the facts establish that while Violet had not been an active competitor for bulk cargo in the past, it had–like the Port–recognized and acted on the expanding market need for bulk cargo operations, bringing it into competition with the Port, a competition which was effectively "nipped in the bud" and eliminated through the taking.[11] Again, the *subjective* contentions of the Port are contradicted by the *objective* reality of what has occurred.

The majority opinion, in finding no manifest error in the district court judgment denying the motion to dismiss the expropriation, relies heavily on the federal district court judgment remanding this case to state court following its removal to federal court. **St. Bernard Port, Harbor, & Terminal Dist. v. Violet Dock Port Inc., LLC**,

_____

[10] See **St. Bernard Port**, slip op. at 3 n.3.

[11] The language of the constitution does not address the level or degree of competition.

17

809 F.Supp.2d 524 (E.D. La. 2011). It quotes from the federal ruling, which found that Violet submitted nothing, "other than its own characterization, to suggest that acquisition of the [Navy] property was the *primary motivating cause* of this 70 acre expropriation." <u>See</u> **St. Bernard Port**, slip op. at 5 (emphasis supplied) (quoting **St. Bernart Port**, 809 F.Supp.2d at 531). This quote suggests–apart from factual disputes–a legal interpretation of Section 4(B)(6) that is at odds with its plain language. In other words, the federal district court seems to advocate for a "substantial factor" or "primary purpose" test for interpreting the mandate of Section 4(B)(6). Such an approach is fraught with danger, as a port would always have the option to take over private property as long as it professed a "primary" purpose of expanding commerce, even if its purpose also had the effect of eliminating private competition. Such an interpretation would render La. Const. art. I, § 4(B)(6) largely meaningless. Regardless, ultimately, this court is the final arbiter of the meaning of this state's constitution, an obligation which we should not yield on a *res nova* issue.

At issue in this case is the decision of the people, as evidenced through the constitution, to protect private enterprise from governmental overreach. I would caution, therefore, against an approach that focuses myopically on the details of the respective "operations" of what are, at their core, both commercial ports in determining whether there is a violation of Section 4(B)(6). Such an approach runs the proverbial risk that one will lose sight of the forest for the trees and, in the process, render the protections of Section 4(B)(6) meaningless.

While I sympathize with sentiments that this case should be limited to its facts, one cannot ignore the legal ramifications that arise from application of those facts. Will the Port (or another public port) next argue that it can expropriate a private port engaged in liquid cargo storage operations because the Port does not currently engage

18

in liquid cargo storage operations and, thus, does not "compete" with a port engaged in such? Will it be able to argue that its "primary" purpose is not to assume the liquid cargo operations, but to expand its bulk cargo operations at that location? Any parsing here ignores what actually, objectively occurred. The Port took the Violet property and assumed its operations while ending competition, violating both the letter and spirit of Section 4(B)(6).

Ultimately, on the facts of this case, the result of the majority opinion is not what was contemplated by the citizens of Louisiana when they demonstrated in the constitution a consistent and concerted effort to safeguard private entities from takeover by the government.

The people of Louisiana repeatedly made judgments that shield private business from the government's entry into the marketplace by taking over an ongoing business or ending competition. The people of Louisiana effectively provided a safeguard for private ownership and for the means of production in the fundamental law of this state. The Port is not without a remedy. If the government wants to enter the marketplace and take over an ongoing business, it must act like any other business; it must purchase the ongoing business at a mutually agreeable price. The constitution is clear–the government cannot simply take a private business to operate the business or to end competition.

For these reasons, I respectfully dissent.

SUPREME COURT OF LOUISIANA

No. 2017-C-0434

ST. BERNARD PORT, HARBOR & TERMINAL DISTRICT
VERSUS VIOLET DOCK PORT, INC., LLC

CONSOLIDATED WITH

ST. BERNARD PORT, HARBOR & TERMINAL DISTRICT
VERSUS VIOLET DOCK PORT, INC., LLC

CONSOLIDATED WITH

ST. BERNARD PORT, HARBOR & TERMINAL DISTRICT
VERSUS VIOLET DOCK PORT, INC., LLC

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
FOURTH CIRCUIT, PARISH OF ST. BERNARD

**GUIDRY, J., dissents and assigns reasons.**

I respectfully dissent from the majority holding today that the St. Bernard Port's taking of Violet Dock Port's private property was a constitutionally authorized expropriation under the facts in the record before us. Although the St. Bernard Port is granted broad powers under La. Const. art. VI, § 21, an important limitation on those powers is set forth in La. Const. art. I, §4, specifically La. Const. art. 4(B)(6). That article provides as follows: "No business enterprise or any of its assets shall be taken for the purpose of operating that enterprise or halting competition with a government enterprise…." It is a well-established legal principle that because "expropriation proceedings derogate from the right of individuals to own property, the law governing these proceedings is strictly construed against the expropriating authority." *State v. Estate of Davis*, 572 So.2d 39, 42 (La. 1990). I disagree with the majority's conclusion there was no manifest error in the trial court's determination that Violet Dock Port's business enterprise or any of its assets

1

were taken by the Port for the purpose of operating that enterprise or halting competition with Port enterprises. The Port's own expropriation plan was premised on taking Violet Port Dock's assets and operating its existing lay berthing business and nascent cargo handling activities to generate funds to finance a future dry and liquid bulk cargo facility. Accordingly, I would reverse the judgment of the trial court.

01/30/18

# SUPREME COURT OF LOUISIANA

## No. 2017-C-0434

**ST. BERNARD PORT, HARBOR & TERMINAL DISTRICT
VERSUS VIOLET DOCK PORT, INC., LLC**

**CONSOLIDATED WITH**

**ST. BERNARD PORT, HARBOR & TERMINAL DISTRICT
VERSUS VIOLET DOCK PORT, INC., LLC**

**CONSOLIDATED WITH**

**ST. BERNARD PORT, HARBOR & TERMINAL DISTRICT
VERSUS VIOLET DOCK PORT, INC., LLC**

**ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
FOURTH CIRCUIT, PARISH OF ST. BERNARD**

**Hughes, J., dissents for the reasons assigned by Weimer and Guidry, JJ.**

1